## Warden v. O'Brien.

(Decided March 9, 1911.)

Appeal from Jefferson Circuit Court
(Chancery Branch, First Division).

1. Real Estate—Verbal Agreements to Buy at Commissioner's Sale.—This court has often decided that verbal agreements to buy real estate at commissioner's sale for the owner are enforcible. But such verbal agreements must be well established by proof before being enforced.

2. Same—Evidence—Tender.—The evidence examined and held sufficient to show a verbal agreement for the purchase of the property, but under the agreement the money which appellee had paid not being due at the time there was no necessity for a tender.

M. A. ,D. A. & J. G. SACHS for appellant.

GREENE & TILFORD for appellee.

OPINION OF THE COURT BY JUDGE NUNN—Reversing.

Appellant was the owner, by devise from her husband, of a house and lot in the city of Louisville, Kentucky. The lot was two hundred feet deep with a twenty-five foot front. She executed a mortgage on this property for $1,200.00 to a man by the name of Ruhl, and there were also several other small liens on it for material furnished and labor performed, and a street improvement lien of thirty odd dollars. All the claims with interests amounted to about $1,600.00. These liens were enforced in the Jefferson Circuit Court and the master commissioner was ordered to sell the property. Appellant was in Cincinnati, Ohio, at the time the sale was ordered, but received information that it would take place on a certain Monday. She arrived home on Saturday before the sale. The property was sold and appellee became the purchaser. The sale was reported

and confirmed. In five or six days after the sale a writ of possession was awarded appellee and appellant resisted it for the reason, as she stated, that appellee bought the property in for her and thereby became her trustee to hold the property in lien for the amount of money she paid with its interest. Appellee denied this.

This court has often decided that verbal agreements to buy real estate at a commissioner's sale for the owner is enforcible. (Estes v. Estes, opinion delivered Feb. 14, 1911.) The authorities hold uniformly that such verbal agreements must be well established by proof before being enforced. The only question in this case for determination is whether such an agreement was made between the parties. Appellant says that on her return from Cincinnati, on Saturday before the sale, she met appellee on 5th street and told her that her property was about to be sold; that she believed the debt for which it was to be sold was too much; that she only owed $1,-200.00, the amount of the mortgage; that she had kept the interest paid up, and that she could not see how it could be $1,600.00. At the instance of appellee, appellant went with her to her store on that street to talk the matter over, and appellant says that she asked appellee if she would buy the property in for her and told her that she, with the assistance of her son and daughter and the proceeds from a moving picture show, would pay it out. They first discussed some means to get the sale postponed. Appellant testified that appellee promised several times to buy the property in for her; that after the conversation in the store had progressed for a while appellee called up her lawyer, Mr. Tilford, for advice, and she testified with reference to this telephone conversation as follows:

"I could tell from her answers what he said almost, and he asked her if she thought the title was all right, and she said she thought it was, and if I had any other property, and she said yes, I had other property, and from her answers I could tell what he was asking, and asked her did she think it would be safe for her to buy this in for me, and she said she thought it would be perfectly safe because she knew all about the house and she knew pretty much when I bought it and she thought it would be all right if she bought it in for me, and so she talked over the phone for quite a length of time. I could tell the conversation word for word if I would

think of it, all she said. She said she was willing to buy it in for me if he thought it was all right, and then of course I couldn't hear what he was saying, but that was the understanding from beginning to finish, that she was to buy this property in for me.''

It was agreed between them at that time that appellant was to get up all her papers, receipts, &c., to ascertain if the amount of the judgment was correct, and for the purpose of getting the proper credits thereof if it was not. Thus affairs stood until Sunday about seven o'clock P. M., when appellee and her husband arrived at the home of appellant. One Williams, who operated the moving picture show for appellant, and a colored man by the name of Geo. Rhodes, were at the house and in the front room when appellee and her husband arrived, and when appellant saw appellee and her husband she remarked "here comes my friend now," and these two men went into an adjoining room and left the door open. Appellee went into the house immediately upon arriving but her husband remained at the gate until he was invited in by one of the colored men. Appellant swears that appellee at this meeting again spoke of the fact that she was going to buy the property in for her own name for the benefit of appellant. Both of the colored men swear that they heard appellee say that she was going to buy the property for appellant; that she asked appellant for her receipts and papers which they had spoken of on Saturday before; that appellant handed them to her and she looked over them and said she could not tell anything about them and asked her if she had any more and appellant said she did; that appellant then told her to get all her papers up and have some lawyer to examine them. Appellee remained at the house for an hour or two. The next morning appellant went to appellee's store, and appellee advised her that they must go to the sale together; that she must not tell anybody that she was going to buy the property for her; that she must not talk to her at the place of sale, because some person might make the property bring more if they thought she was buying it in for her. They left the store together and went to the place of sale, but appellee left appellant at a certain place to go get her lawyer to do the bidding for her. They all arrived some little time before the commissioner began to cry this particular sale. Appellant says that she did not talk

to anyone at the sale except a few times to appellee and
for only a moment or two at a time; that she found
some neighbors at the sale by the name of Muth and
she discussed with appellee the purpose of their being
present, and appellee ascertained from them that they
were there for the purpose of buying the property and
informed appellant. Both parties agree as to this mat-
ter. Appellant testified that she remained near appel-
lee most of the time during her presence at the sale,
as requested by appellee, but did not converse with any
one except appellee, and then for only a few moments
at a time. The property was struck off to appellee at
the price of $2,075.00, and she paid $100.00 cash and
executed two bonds for the balance, one due in six and
the other in twelve months. A report of the sale was
made and, in a day or two, confirmed and a deed ordered
to be made to appellee reserving a lien on the property
for the unpaid part of the purchase price, and a writ of
possession was soon awarded appellee which appellant
is now resisting for the reasons before stated. Appel-
lant testified that the reason she requested appellee to
purchase this property for her on the terms stated, was
because they had been intimate friends for fifteen years
or more; that this close friendship had existed from the
time that she had cured appellee's boy of St. Vitus's
dance; that she had treated appellee in person twice
since that time. Appellant had been a licensed physi-
cian, was a graduate of a colored medical college located
in Louisville, but she had not practiced medicine for sev-
eral years. She testified that she is a spiritualist; that
she held seances in her own residence and other people's,
appellee's being one of them, and that appellee attended
several of these meetings. Appellee denied that she
promised appellant to buy this property for her, and
testified that she bought it for herself; that it was hard
to get appellant to understand that, but she did her best
to explain it to her; that she did not answer "yes" or
"no" Saturday when appellant asked her to buy it in
for her; that she did not have the conversation over the
telephone with her lawyer as related by appellant; that
she told appellant on Sunday at her house that she would
not buy the property in for her and that she was going
to buy it for herself, and that she also told her the same
on Monday morning before the sale. Appellee intro-
duced a colored woman who was in the store Monday

when she was talking to appellant, for the purpose of making a purchase, who stated upon examination in chief, several times that she heard appellee say to appellant that she was going to buy the property in for herself, but upon cross-examination she said that she heard appellee say to appellant that she was going to buy it in her own name. She stated this several times and said it was all she heard pass between them. On re-examination she again changed this statement, and said that appellee stated that she was going to buy it in her own name for herself, and again, for herself in her own name. Appellee introduced Tilford and Muth who were at the sale, and they testified that they did not notice appellant being near appellee during the sale, but that they were not paying any attention to her. She also introduced several witnesses to prove the bad character of appellant, but when these witnesses were cross-exmained it appears that their opinions with reference to that matter were complaints of the seance held by appellant in her home at night. Appellant introduced five or six witnesses who testified that her reputation was good. Appellant testified that appellee purchased the property for her benefit and heard nothing to the contrary until she received notice of the writ of possession five or six days after the sale. Appellee and her son testified that they went out to the house on Friday after the sale and demanded possession of appellant and she refused to give it. Appellant testified that they were there; that they asked for the receipts, or papers, but denied that they asked for possession of the property. Appellee testified that it was true that she was a friend of appellant; that appellant cured her boy of St. Vitus's dance after two physicians had given the case up as hopeless; that when she went to appellant for medicine for the boy she thought he would be dead before she could return; that she gave the boy the medicine and treatment according to directions; that he got well in about three days, and that he is still strong and healthy. She denied, however, ever attending any seance, except one at the home of appellant. Appellee's testimony cast some aspersion upon the character of Williams who was in appellant's house on the Sunday that appellee and her husband visited there. This is the substance of all the testimony.

After a careful consideration of the testimony, we are of the opinion that appellee bought this property in for appellant, and the testimony tends to show that appellee was to pay in the $100.00 cash at the time of the sale, and appellant, with the assistance she could get from her children and other sources, was to pay the bonds when they fell due, and return to appellee the $100.00 with its interest. Appellant swears pointedly that appellee purchased the property for her, and she is sustained by Williams, Geo. Rhodes and strong circumstances. When appellee introduced her attorney he testified only to what occurred at the time of the sale; he did not contradict appellant as to what was said in the conversation he had with appellee over the telephone on Saturday before the sale. Appellant testified that appellee said to him that she was going to buy the property in for appellant; that she repeated it several times; that he asked her if the title was good, and if appellant owned any other property and told her if the title was good it would be safe to make the purchase for appellant. If this did not occur, Tilford knew it and could have stated, if asked, that it was or was not true. This is a strong circumstance in favor of appellant. Her strong friendship for appellant was sufficient to induce her to favor appellee. The manner in which appellee testified shows that she believed appellant was laboring under the impression all the time that the property was brought in for her benefit. In fact, appellant stated that with all her efforts she could not get appellant to understand that she was going to buy the property for herself. Considering all these matters, we believe the court erred in overruling her response to the writ and adjudging appellee entitled to the possession of the property. The lower court said in its opinion that appellant did not tender appellee the money which she had paid, and gave that as a reason for the response not being sufficient. Under the agreement, the money was not due at that time and there was, therefore, no necessity for a tender,

For these reasons the judgment of the lower court is reversed and remanded for further proceedings consistent herewith.