## Holtzclaw, Administrator, et al. v. Wells.

(Decided October 22, 1915.)

### Appeal from Lincoln Circuit Court.

Trusts—Parol Constructive Trust.—To establish a parol constructive trust, especially if its establishment is contradictory of writ-

ten documents, the evidence of the facts necessary to create the trust must be strong and convincing, and such as to leave no rational doubt in the mind of the court as to the real facts of the transaction.

R. H. TOMLINSON for appellants.

GEORGE D. FLORENCE and P. M. McROBERTS for appellee.

OPINION OF THE COURT BY JUDGE HURT—Affirming.

Overton Adams, an unmarried man, resided in Lincoln County, Kentucky, on a farm of one hundred and two and one-half acres, of which he was the owner of an undivided one-third interest. A sister resided with him, and previous to his death, which occurred on the 23rd day of December, 1905, his sister died. The appellee, J. T. Wells, for several years previous to the death of Adams, also resided with him, but exactly upon what terms is not shown. In 1904, Ann Gover, who was the owner of an undivided one-third interest in the farm upon which Adams lived, instituted a suit against Adams and Charles Singleton, the other joint owner, for a sale of the land and a division of its proceeds. The court adjudged that Adams, Singleton, and Gover were each an owner of an undivided one-third of the land and adjudged that it be sold. The sale was made on the 8th day of August, 1904, when the appellee, J. T. Wells, became the purchaser, at the price of $300.00, and executed bond for the purchase price with J. M. Singleton as his surety. The sale was duly reported, when Ann Gover filed exceptions to the sale, and thereafter additional exceptions, which the court finally heard and overruled on the 8th day of March, 1905. On the same day the appellee gave his check to the master commissioner, on a banking institution at Crab Orchard, for the amount of $310.00, which was the purchase price of the land and its interest, and on the same day the court directed that after the payment of the costs, that one-third of the purchase money should be paid to each of the joint owners of the land. On the following day, the 9th of March, Overton Adams filed an affidavit, signed and sworn to by himself, in which he recited the fact that the land had been sold and the sale confirmed and the purchase price had been paid to the commissioner of the court, and that the court had directed one-third of the proceeds of the sale of the land to be paid to Charles Singleton, and that he had previous

thereto bought Singleton's interest in the land for the sum of $20.00, and was entitled to Singleton's portion of the proceeds of the sale, and asked that the order of the court for distribution of the funds be set aside, to the extent that it ordered the payment of one-third of it to Singleton, and in place thereof that the court order it to be paid to him. On the same day Adams executed an order upon the master commissioner of the court, directing him to pay to M. C. Saufley, who seems to have been his attorney, $7.50 out of any fund in the hands of the master commissioner coming to Adams, which had arisen from a sale of the land, and this order was accepted by the master commissioner and the money paid. The court sustained his motion to the extent of setting aside the order directing the payment of one-third of the proceeds of the sale to Singleton, and ordered payment of it withheld for the further adjudication of the court. Thereafter, on the 30th day of June, 1905, Adams filed an answer and cross-petition in the case, in which he set up the same facts as in his affidavit, showing his right to Singleton's portion of the proceeds of the sale of the land and asked that it be paid to him.

Adams died intestate, and thereafter, on the 11th day of May, 1911, his administrator and thirty-two of his collateral heirs instituted this suit against the appellee, Wells. The allegations of the pleadings in this case are fully set out in the opinion upon a former appeal of this case, which may be found in 153 Ky., 768. Suffice it to say, however, that the plaintiffs below, who are the appellants here, alleged in substance, that Overton Adams, their ancestor, was the owner of an undivided two-thirds interest, and in addition, one sixth of the land which was sold in the action of Gover v. Adams, &c., and that he desired to become the purchaser of it at the decretal sale, but upon the day upon which the sale was made, that he was sick and unable to attend the sale, but for the purpose of purchasing the land at the sale, he made the appellee, Wells, his agent to attend the sale and buy the land for him, and, also, procured a surety in the bond which would have to be executed for the sale price, and that Wells fraudulently purchased the land for himself, and caused himself to be reported as the purchaser, and procured a confirmation of the sale and execution to him of a deed, all of which facts were unknown to Adams, who was relying upon Wells to take care of his interest

in the matter, as directed, and who did not learn until after the sale was confirmed, the real truth as to the actions of Wells, and that he had offered to pay to. Wells the amount that he had paid upon the bond for the purchase price of the land, which Adams was then able to do, and demanded of Wells that he convey the land to him, but that Wells had fraudulently refused to do so, and had continued to hold the land and its title in fraud of the rights of Adams until his death, and since that time in fraud of the rights of the appellants, who were his legal heirs and succeeded to their ancestor's rights pertaining to the land, and prayed that the court adjudge that the transactions amounted to a constructive trust, and that Wells was holding the land as trustee for appellants, and that he be required to convey the land to them.

The appellee, by answer and amended answers, controverted all the allegations of the petition, and in addition plead that his purchase of the land and his procuring a deed, and the payment of the purchase money by him were facts well known to the decedent at all times, and that decedent approved of same and filed no exceptions to the report of sale, and, also, set out the fact of the decedent filing the affidavit and motion on the 9th day of March, after the confirmation of the sale and the payment of the purchase money, and the filing of his answer and cross-petition on the 30th day of June, thereafter, and relied upon same as an estoppel to the plaintiffs' cause of action set up in their petition, and further plead, that since the death of the decedent that the appellants had, by an order of court, procured the payment to their attorney, as a portion of his fee in the case, the sum of $100.00, which he alleged was a part of the proceeds of the sale of the land which belonged to the decedent, and relied upon such fact as a further estoppel to the appellants' cause of action.

The affirmative allegations in the answer and amended answers were duly controverted by replies, and the cause coming on to be heard upon the pleadings and proof, the court adjudged that the petition of the appellants be dismissed, to which they excepted and prayed an appeal to this court.

Proof was offered by the appellants tending to prove that the land was worth from $700.00 to $1,000.00; that Adams was a man of good sense, able to read and write; and was near seventy years of age; that Wells had lived

in the same house with him for several years previous to the sale and that Adams seemed to have a great affection for him, and sometimes in referring to him, would call him "My boy;" that two or three days previous to the decretal sale, Adams, accompanied by Wells, went to a neighbor, to whom Adams said that the land was to be sold in order to get Ann Gover's interest out of it, and that he was unwell and could not go to the sale and he wanted the neighbor to go and assist Wells in buying in the land. The neighbor inquired how much he should pay for it; Adams answered that Tommy (meaning Wells), would attend to that, and that he just wanted the neighbor to go on the bond for the purchase money, which the neighbor promised to do and did go and attend the sale, where Wells was the only bidder, at the sum of $300.00, and the land was sold to him, and that the witness became Well's surety upon the bond. It was proven by another witness that on the day of the sale, but after it had taken place, that Wells jokingly said that he had bought the land, and that he was going home and tell Adams, that he had bought it for himself. By another witness it was proven that, some time after the sale, Adams requested him to see Wells and see if any arrangements could be made about the land. Wells and the witness went to Adams, and Adams and Wells agreed that they would survey off a part of the land and that Adams could live there and keep his property there, as long as he lived, but at his death that portion of the land should revert to Wells. Another witness testified that, about the middle of the summer of 1905, he went with Adams to Lancaster, to which place Adams went for the purpose of consulting a lawyer about bringing a suit for the land.

For the appellee, it was proven that he resided in the same house with Adams at the time of the sale and continued to live in the same house until April or May, 1905, when he married, and thereafter lived in another house upon the same land; that shortly after the sale Wells went to work upon the land, clearing it up of its brush, erecting new fencing, cutting down trees, which he caused to be sawed into lumber and which he brought to the land and used in improvements upon it. By another witness it was proven, that in January, 1905, she went to Adams for the purpose of renting a house which was on the land; that Adams said to her, that he had

given the land to Wells, and that she would have to see him. She did so and rented the house from Wells, and the rent was paid to Wells by work on the farm. Another witness stated that in March or April, 1905, he accompanied Adams to Stanford, and while there, that Adams said that he had gone to the clerk's office to see about a deed between him and Wells, and that he had found it and that it was all right. By four different witnesses it was proven, that he said to one of them, in February, 1905, that Wells was to have everything that he had, and that he did not want any kin folks to have anything. In April, 1905, he said to another that he had taken a liking to Tommy Wells, and was going to give him all that he had. In the spring of 1905 he said to another that he intended for Wells to have everything that he had, and that when he got his land out of controversy in the courts, that he meant to fix it so, that Wells would get it, and to this same witness he made this statement, in connection with telling him that he had sent Wells to buy the place, that he was sick and could not go.

The above was, in substance, all of the evidence offered in the case on either side, in addition to the affidavit and motion made by Adams on the 9th day of March, 1905, and his cross-petition in the case on the 30th day of June, 1905, and the facts recited in the affidavit and cross-petition. It will be observed that there is no evidence to support the allegation, that Adams sent Wells to buy the land for himself, neither is there any evidence which shows that Adams ever desired to buy the land for himself, nor is there any evidence tending to show that he ever expressed any dissatisfaction in regard to the sale of the land and the purchase of it by Wells, except the statement of the witness who testified that he went with Adams to consult a lawyer about bringing suit to recover the land, but it does not appear that his claim at that time was based upon anything growing out of the purchase of the land by Wells and the witness who testified about the agreement between Adams and Wells that Adams should live upon a portion of the land during his lifetime, and then the portion was to revert to Wells. The latter statement, however, falls short of showing that there was any dissatisfaction on the part of Adams about the purchase of the land by Wells. The statement made by Adams to the neighbor, who went upon Wells' bond, does not show whether he intended

that Wells should buy the land for him or whether he intended that Wells should buy the land for himself, and that he was merely assisting the young man in arranging the purchase of the land. When Adams filed the affidavit on the 9th day of March, six months after the decretal sale, and after the exceptions to the sale had been overruled, and the order made to distribute the proceeds of the sale, and in which affidavit he stated that the sale had been confirmed and the purchase money paid, and asked that Singleton's portion of it should be paid to him in place of Singleton, it is difficult to believe that Adams was laboring under any difficulty or want of knowledge in regard to the whole transaction. He was obliged to know that the purchase money had not been furnished or paid by him, and his order given upon the same day to pay to his attorney a portion of the proceeds of the sale and thereafter when he, on the 30th day of June, filed his cross-petition, stating in effect the same as the statements of his affidavit previously filed, his conduct is very inconsistent with the contention that he thought that he was the purchaser of the land through Wells, or that he had any agreement with Wells to purchase the land for him. All of the circumstances of the case conduce to show that Adams' desire was that Wells should have the land, and while the evidence is not altogether satisfactory that Wells' hands are clean in the transaction, it falls far short of establishing a parol constructive trust.

A parol constructive trust arises when a party obtains the legal title to property in violation, express or implied, of some duty owed to the one, who is equitably entitled, and when the property thus obtained is held in hostility to the beneficial rights of the one equitably entitled to it. Vol. 2, Pomeroy, Section 1044.

This court has uniformly upheld the doctrine of parol constructive trusts, and has maintained them where the facts, which go to establish them, are proven by certain and undoubted testimony and such as to leave in the mind of the court no rational doubt as to the truth of the facts necessary to establish the trust. Roche, et al. v. George's Exor., 93 Ky., 609; Northcutt v. Hogan, 4 R., 364; Taylor v. Fox's Exor., 162 Ky., 804; Warden v. O'Brien, 142 Ky., 633.

It has, furthermore, been held, that the evidence to create a parol trust must be strong and convincing, where

its establishment is contradictory to written documents showing the legal title to the property in some one else. We can not say that in the case, at bar, that the facts sought to be established, which are necessary to the creation of the trust alleged, are proven by such certain and undoubted testimony, that no rational doubt is left in the mind of the court as to the transaction between appellee and decedent, and for these reasons there is not any sufficient reason to disturb the judgment of the chancellor, which seems to be in accordance with the principles above enunciated.

The judgment is affirmed.