## Henry, et al. v. Henry's Executors, et al.

(Decided October 8, 1918.)

### Appeal from Montgomery Circuit Court.

1. Trusts—Evidence Necessary to Establish Secret Trust.—The evidence necessary to establish a secret trust under an absolute deed must be clear and satisfactory both as to the existence of the trust and of its terms, especially after the lapse of considerable time and after the death of the parties.

2. Trusts—Evidence Necessary to Establish Secret Trust.—Evidence examined and held to be insufficient to sustain appellants' claim

of an equitable interest under a secret trust in lands the legal title to which is in appellees.

3. Contracts—Evidence—Statement in Will.—The assertion in a will that the testator under a contract owns an interest in lands the title to which is in another, as any other self-serving statement not made in the presence of the adverse party, incompetent as evidence to establish the existence or terms of the alleged contract.

LEWIS APPERSON, ROBERT H. WINN and H. R. PREWITT for appellants.

J. H. HAZELRIGG, E. C. O'REAR, A. A. HAZELRIGG, W. B. WHITE and C. C. TURNER for appellees.

OPINION OF THE COURT BY JUDGE CLARKE—Affirming.

At the sale pursuant to judgment of the Montgomery circuit court, in the case of Henderson v. J. W. Henry, &c., made by the master commissioner on October 16, 1899, and after an appraisement of the property at $8,000.00, J. E. Henry became the purchaser, at $8,635.95 of about 264 acres of land in Montgomery county, theretofore owned by J. W. Henry, his father. The report of the sale was confirmed at the following January term of the court, and at the next April term, an order was entered directing the master commissioner to convey the land to J. E. Henry, the purchaser, which was done on May 5, 1900, at which time he paid the sale bonds in full. J. W. Henry, the judgment debtor and the father of J. E. Henry, the purchaser at the judicial sale, lived until the year 1911 upon the land and with his son, J. E. Henry. J. W. Henry left a will executed by him about a month before his death, and while confined to his bed from a disease from which he afterward died, by the terms of which he devised "My intrust in land under contract with J. E. Henry and held by A. A. Hazelrigg to be divided equally among my four children."

J. E. Henry died in November, 1913, holding the legal title to and in possession of the 264 acres of land above referred to, and he too left a will in which he disposed of the whole of this land. After his will had been probated, his executors, his widow and his children to whom he had devised the land, brought this action against the other three children of J. W. Henry, seeking to quiet the title of J. E. Henry's estate as against them. The other three children answered, and by way of counterclaim asserted

that J. E. Henry's purchase of the 264 acres of land at the decretal sale in the Henderson suit was under an arrangement between him and his father, J. W. Henry, whereby J. E. Henry was to cultivate the farm, pay the taxes, pay the Henderson mortgage from the proceeds of the farm, occupy in the meantime a house on the farm, and in the end to have one-third of the lower part of the farm known as "the lower farm" for his services, and that by said contract J. E. Henry agreed that in case he failed to pay the debt he was to pay a reasonable rent for the land; that he failed to pay the debt; that a reasonable rental for the land was $1,400.00 per year, and that there should be an accounting before a commissioner as between the two estates of all matters growing out of the land transaction. The reply in addition to a traverse pleaded laches, and the fact that J. W. Henry, in 1905, in a proceeding in bankruptcy, had filed his sworn schedule in which he denied that he owned any interest in this land. In response to the plea with reference to the bankruptcy proceedings, defendants pleaded that J. E. Henry had admitted the existence of the agreement after the termination of the bankruptcy suit, and that the bankruptcy proceedings had become final and absolute, and that any assets unadministered reverted to and became the property of J. W. Henry and his estate.

After a large volume of testimony, much of it incompetent, had been taken, and upon submission, the trial court dismissed the counterclaim and quieted the title of J. E. Henry's estate to the entire 264 acres as against the other children of J. W. Henry, and from this judgment J. W. Henry's children, who were defendants below, are appealing.

As J. E. Henry at the time of his death was in possession of the land, and at that time and for about fourteen years continuously theretofore held the legal title thereto, the first and most important question involved is whether or not the appellants, by their testimony, overcame the legal presumptions against them in favor of the plaintiffs by reason of the possession of and title to the land held by J. E. Henry at the time of his death. Before determining this question the chancellor correctly sustained the exceptions to the evidence of self-serving statements made by J. W. Henry in the absence of J. E. Henry, and to the evidence of the defendants as to admissions alleged to have been made to them by their deceased

brother, J. E. Henry. We are also clearly of the opinion that the will made by J. W. Henry is not competent evidence upon the question of his right to an interest in the land, and that it is incompetent upon this inquiry as any other self-serving statements made by him would be, and we shall not encumber this record by further reference to any of such evidence.

The competent evidence on behalf of appellants as to the alleged secret trust agreement may be divided into two classes: first, as to the inadequacy of the purchase price at the decretal sale in 1899, when J. E. Henry acquired title to the land; and, second, as to statements of J. E. Henry, or of J. W. Henry in his presence, as to the existence and terms of a secret trust. Upon the first question some seven witnesses fixed the value of the land at the time of the decretal sale at about $60.00 per acre, which is about $16,000.00 for the farm, and it was proven that J. E. Henry, within about six months after his purchase of the land, in an application to the Union Central Life Insurance Company for a loan upon the land, swore that it was worth $17,500.00; and Charles H. Frazer, one of the appraisers at the decretal sale, testifies that although the land was really worth $60.00 per acre, he was induced by J. E. Henry to appraise it at only $8,000.00. The other appraiser is dead, and we are not willing to give to Frazer's present oath any more importance than he now gives to his official act as appraiser at the time of the sale, so the fact remains that the land was appraised at $8,000.00 and brought at the sale $8,635.95.

It is a well known fact that it is quite hard, no matter how honestly attempted, to lose sight of present values in an effort to fix a value at some remote date, and we are unwilling to accept as conclusive mere opinion evidence of previous value where given after so long a lapse of time as fourteen years, for the purpose of overcoming such evidence of the value at that time as is furnished by the appraisement and the amount produced at a public sale, especially where, as in this instance, the land, if it had any such value as now attributed to it, would have been almost certainly levied upon by some of J. W. Henry's numerous creditors in an effort to save some part of their debts, and who would have been present, at least, at the public sale to prevent the members of the debtor's family becoming the purchasers without competition and upon a fraudulent appraisement and for a price far be-

low its real value. And while more witnesses have testified for the appellants that the land was in 1899 in their opinion worth approximately $16,000.00, than have testified for the plaintiffs that it at that time was worth but little if any in excess of what it brought at the sale, we are unable to agree with counsel for appellants that the evidence satisfactorily establishes as a fact that the land was sold for a grossly inadequate price.

In the second class of evidence is the testimony of John Willoughby, which is discredited by his own admission, and the unimpeached testimony of John Stockdale, John Lee, J. W. Mason, Tom Freeman, John Butler and L. A. Stith, who testify to conversations, often angry discussions, in which the father claimed some interest in or all of the land under a contract which the son did not deny, or to admissions by the son that the father had some interest in the land; but none of this testimony proves or even indicates the terms of the contract or defines the interest of the father in the land; and all of this testimony is, we think, entirely consistent with the son's absolute title to the land, subject only to his promise to or even a contract with the father, who was an old man, estranged from his other children, and otherwise homeless and dependent, that so long as the son owned the land and the father lived, he should have a home on the farm, and that this is the only importance that should be attached to it, is to our minds quite conclusively indicated by the fact that the father, in 1905, in the bankruptcy proceedings, swore he owned no trust interest in any land the title to which was held by another, and the still more significant fact that, when in 1907 or 1908, the son was bitten by a vicious jack and the father feared he might die from tetanus, the latter was apprehensive that, if the son should die, he might be left without a home, and procured friends to ascertain what provision the son's will made for him, and seemed relieved when shown a copy of the will in which he was given a home upon the land for life. Neither of these facts is denied, but both are clearly established, and neither is consistent with J. W. Henry's owning any interest in the land other than a life right which could not, of course, avail appellants.

In addition, J. W. Henry, in making his will under circumstances which indicate that he was at least somewhat bewildered, by attempting to devise "my intrust in

land under contract with J. E. Henry and held by A. A. Hazelrigg'' was clearly at sea as A. A. Hazelrigg never held any such contract but did hold J. E. Henry's will in which J. W. Henry was given a life interest in the land, and besides Judge Hazelrigg, a friend, relative and trusted adviser of both, testified that the only contract of which he had ever heard, much less held, was that the son had promised the father a home upon the land so long as he lived, if the son succeeded in paying for it.

Another circumstance, even if not laches, entitled to some consideration and sufficient at least to require of plaintiff strict compliance with the rule that both the existence and exact terms of a secret trust must be established by clear and convincing testimony, Neel v. Noland, 166 Ky. 455; May v. May, 161 Ky. 114, and Holtzclaw v. Wells, 166 Ky. 353, is the fact that J. W. Henry did not during the eleven years he lived on the land, although frequently at odds with his son, take any steps to enforce the trust, nor did plaintiffs after his death and the publication of his will during the lifetime of J. E. Henry.

The facts in this case, as we view them, quite clearly distinguish it from the cases of Stone v. Middleton, 144 Ky. 284; Stubbins v. Briggs, 68 S. W. 392, and Combs v. Combs, 99 S. W. 919, relied upon by counsel for appellants, although the relationship and circumstances of the parties to these cases were quite similar to those existing in this case, and we are quite convinced that the judgment of the chancellor is amply sustained by the evidence, and it is, therefore, affirmed.