### Webb, et al. v. Webb, et al.

(Decided October 16, 1923.)

### Appeal from Floyd Circuit Court.

1. Champerty and Maintenance—Purchase by Life Tenant Not Champertous.—It cannot be said that a life tenant's actual rightful possession is adverse to himself and there is no reason why a purchase of the land by him and a deed executed in accordance therewith would be champertous, under Ky. Stats., section 214.

2. Partition—Evidence Held Not to Show Legal Title in Plaintiffs at any Time.—In an action by children by a first marriage against widow and children by second marriage to recover and divide land, evidence held not to show that plaintiffs had the legal title to the property at any time.

3. Life Estates—Execution of Deed to Third Persons Sufficient Notice of Adverse Claim.—The execution and recording of a deed by a life tenant reserving a life estate and conveying the remainder in fee was sufficient to give notice to remaindermen that he was claiming adversely to them and adverse possession began at that time.

4. **Trusts—Rights of Husband Paying Part of Purchase Price of Land.**—While Ky. Stats., section 2353, abolishes resulting trusts except as provided, if husband entered land under claim of his wife and thereafter paid all or part of the purchase price due thereon and as a tenant by curtesy took the conveyance to himself, his title would inure to the benefit of the remaindermen, subject to his right of reimbursement for the amount so paid, under section 214.

5. **Pleading—No Proof of Matters Not Put in Issue.**—No proof can be offered of matters not put in issue by the pleadings, and under the Code system of pleading new matters of avoidance or defense cannot be given in evidence under a general denial, but it must be specially pleaded.

6. **Life Estates—Statute of Limitations Runs as to Suit Attacking Deed, Seeking Reformation or to Have Trust Declared.**—Though statutes of limitations do not ordinarily run against the remaindermen in a suit to recover possession of property, they do run in a suit attacking a deed seeking reformation or to have it declared a trust.

7. **Evidence—Deed 47 Years of Age Proves Itself.**—A deed 47 years of age and free from suspicion proves itself under the ancient document rule when attacked.

8. **Trusts—Constructive Trust Must be Established by Clear Evidence.**—A constructive trust cannot be established by the mere preponderance of evidence, but must be established by evidence which is clear, definite, unequivocal, and satisfactory.

9. **Trusts—Evidence Insufficient to Establish Constructive Trust.**—In an action by children of a first marriage against widow and children of second marriage to recover land, evidence held not sufficiently clear to establish a constructive trust.

10. **Deeds—Evidence Held to Show Competency of Grantor.**—In an action to recover and divide land, evidence held to show defendants' grantor to be competent.

11. **Deeds—Burden Upon Grantee in Confidential Relation with Grantor to Show his Mental Competency as Against Heirs.**—Where the circumstances show a confidential relation between the parties, and a deed without valuable consideration is made by one who is aged and infirm and living with the grantee, the burden is upon the latter to show the bona fides of the transaction as against grantor's heirs.

12. **Descent and Distribution—Instrument of Distribution Not Invalid by Reason of Advance in Value of Lands.**—A deed of land intended as a settlement among children was not rendered invalid because an advance in value of land rendered the division unequal.

C. B. WHEELER for appellants.

B. F. COMBS and A. J. MAY for appellees.

Opinion of the Court by Judge McCandlless—Reversing.

Johnathan Webb died in August, 1919. He had married twice and had raised two sets of children. His first wife, Artie, daughter of Thomas Osborne, died in the year 1874, leaving six small children. He married the second time in 1879, his last wife, Jemima, and two daughters surviving him.

In December, 1919, the descendants of his first wife brought suit in equity against Jemima Webb and her two daughters, seeking to recover a valuable tract of land in Floyd county, alleging ownership through their mother; that it had been occupied by their father as a tenant by curtesy; that he had become mentally incapacitated to contract, and through the undue influence of Jemima Webb had on the — day of August, 1904, executed a deed of conveyance to Jemima Webb for life, with remainder to her two daughters, and that they were claiming it adversely to plaintiffs.

The prayer was for a recovery and division of the land among the plaintiffs, and in the alternative, if this was denied, for a cancellation of that deed and a division among all the heirs of their father. The defendants, Jemima and Ida, answered traversing all the allegations of the petition, pleading title deducible from the Commonwealth and various other affirmative defenses, including different statutes of limitation, all of which were traversed by a reply.

On final submission the chancellor expressed the opinion that Johnathan Webb was mentally incapable of executing the deed of August, 1904. He was further of the opinion that the land in controversy was the property of plaintiffs' mother, Artie Webb, and that none of the various defenses applied, and gave judgment in favor of plaintiffs for the land in question and quieted their title thereto. A great deal of evidence was taken, much of it being incompetent and irrelevant.

It appears that Johnathan Webb married Artie Osborne prior to the year 1860. His means were limited and the couple moved on the lands of Thomas Osborne.

In the settlement of the estate of Adam Gearheart in 1860 a large body of land was sold at decretal sale, and John Martin became the purchaser at the price of $6,000.00. There was an executory contract between John

Martin and Joe Gearheart that the latter would take the upper end of these lands at the price of $2,500.00. The land in question was carved out of Gearheart's part, and it is claimed by appellants that it was sold by him to Johnathan Webb by title bond, dated March 20, 1860, for a consideration of $2,000.00; that this consideration was paid by him, partly to Gearheart and partly to John Martin on Gearheart's indebtedness, and that upon the final payment on March 15, 1875, John Martin, the legal title holder, conveyed to him in fee simple; that Webb took possession of the land at the time of purchase from Gearheart and claimed and held same thereafter, openly and adversely to all the world. It is not disputed that Webb was in possession of this land from 1863 until his death, and it is in proof that as early as 1865 he was made a party defendant in a lawsuit over an adjoining tract in which it was alleged that he "was claiming and holding possession of this tract under a purchase from Joe Gearheart." The lands in dispute in that suit were afterwards sold by executory contract to Thomas Osborne, and he executed a title bond therefor to Johnathan Webb, and in describing the boundaries called for the "Webb" lines.

The land in controversy was conveyed to Johnathan Webb by John Martin on March 15, 1875, by deed which was recorded on July 10, 1875, the recited consideration being "a title bond heretofore executed by Joseph Gearheart to Johnathan Webb, Jr., of date March 20, 1860, receipt whereof is hereby acknowledged." This was pleaded and relied upon in defendants' answer and a copy filed therewith.

Later, in 1892, the Gearheart heirs sued Johnathan Webb for a recovery of this land, and he defended and gave his deposition, in which he fully recited all the matters above set out, and stated he had been in adverse possession thereof since his purchase from Gearheart, a period of thirty-one or thirty-two years.

Later the railway company brought suit to condemn a right of way over this land, making Johnathan Webb and his vendees in the deed of 1904 parties defendant, and settling with them for the consideration.

On August 12, 1904, five days subsequent to the execution of the deed to his second wife and her daughters, Johnathan Webb executed a deed to one of his older sons for the tract of land he had purchased from Thomas Os-

borne. The recited consideration was $2,000.00, of which $500.00 each was to be paid to three other older children, and $500.00 was given grantee as an advancement, it being recited that the grantor had already advanced $500.00 each to the other two of the older children.

As against this there is some evidence to the effect that Thomas Osborne was a party to the transactions with Joe Gearheart; that the tenants of Gearheart recognized him as the purchaser; that he, or he and Johnathan Webb together, made payments thereon to Gearheart; that Webb was living on a part of Osborne's home farm and did not move on this tract until 1863; that subsequent to this Osborne purchased other lands, and conveyed same to his other daughters for various considerations, crediting each with an advancement of $500.00, and requiring the son-in-law to pay the remainder, finally deeding his home farm (the one he owned at the time of Artie's marriage) to be divided between his two sons, and that during all of this time he assumed the active management and control of the business; that he and his sons and sons-in-law worked in conjunction, and a number of witnesses testified that they had heard or that it was the general understanding in the family and community that this place was Artie's part of her father's estate, and all that she received therefrom. There is some evidence, mostly by the parties, that she so claimed it, and of admissions to that effect upon the part of Johnathan Webb. Aside from this it is testified that on one occasion he agreed to sell this property, but declined to make deed because he could not make a good title to the part of Artie's children; however, this witness gave two depositions in the case, this statement appearing in the second, while in the first he said Webb declined because he had gotten out of the notion of selling. Another witness says that on one occasion Webb spoke to him of the land as "this is poor Artie's part." Another says that Webb told him there might be some contention over this land. After he had executed the deeds of 1904 it was rumored that the other children would try to claim the land, and he tried to secure quitclaim deeds from them. He also tried to sell the mineral rights in the land in order to settle with them.

It is contended by appellants that under the facts stated no cause of action arose in favor of appellees, except on the theory of a constructive trust, and that ap-

pellees are not entitled to recover on that theory for various reasons which will be noted hereafter.

On the other hand, appellees insist that a legal title by possession is shown to have existed in their favor at the time of the execution of the deed of March 20, 1875; that at that time Johnathan Webb was tenant by curtesy in the property of his deceased wife and would not be permitted to purchase an outstanding or hostile claim as against the estate of the remaindermen, consequently that the deed to him was ineffectual for any purpose and could be disregarded by them. Further, at that time the possession of Johnathan Webb was that of his children, who held same adversely, and therefore the deed was champertous and void. It is difficult for us to grasp the last proposition. Conceding that such possession harmonizes with the two estates, it cannot be said that the life tenant's actual rightful possession is adverse to himself, and we can see no reason why a purchase of the land by him and a deed executed in accordance therewith would be champertous. Indeed, in our statute of champerty it is provided:

"Persons in possession may purchase in the adverse outstanding title or claim, and such purchase shall be good and inure to the benefit of the person making the same or to the person under whom he claims and holds the land so possessed." Ky. Stats., sec. 214. We conclude that this deed was not champertous.

If the plaintiffs had acquired legal title by adverse possession at the time of its execution this deed would not be necessary to perfect their title, but it would inure to their benefit and its effect would be to strengthen same unless their father had repudiated his tenancy and claimed under the deed adversely to them.

As to whether they had acquired legal title at that time there is no proof of any contract, either oral or written, between Osborne and Gearheart, and no direct proof of a gift by Thomas Osborne to his daughter. Much of the evidence consists of the memory of witnesses as to transactions occurring sixty years or more ago; it is vague and indefinite, for the most part hearsay, or statements of the understanding in the family and community as to the ownership of the property, supplemented by occasional admissions upon the part of Johnathan Webb and declarations of ownership by his wife, the strongest proof being that Osborne paid something on the land,

and that the tenant who was on the land at the time Gearheart owned it remained on it thereafter, and paid some rent in corn to Osborne, and that Webb did not take possession of it until two or three years after the date of the title bond; that Osborne made advance payments to all of his other children on the purchase price of lands deeded to them, and gave nothing else to this daughter. From this we might infer that Osborne contracted and paid something on the land and delivered possession thereof to his daughter, but when we consider Webb's declaration of ownership in the suit filed against him in reference to a boundary line by an adjoining landowner in 1865; the undisputed proof that he paid at least a part if not all of the consideration; that he was a man of business acumen, industry and strength of character who made and accumulated money during his entire life; the fact that during all of that period he was claiming to be the absolute owner and that Thomas Osborne during the lifetime of Artie Webb sold to him another tract of land in which he referred to Webb's line as a part of the boundary; the fact that Thomas Osborne exercised minute care and caution in his real estate transactions with his other children, all of which were in writing, and the great lapse of time since the execution of the deed; it is equally as consistent with the proof to presume that Webb was a party to the original transaction with Gearheart or that the deed was made in accordance with the original agreement and understanding of the parties; at least the proof is not sufficient to show a perfected legal title on the part of Artie Webb's children on the 15th of March, 1875.

Even if it should be conceded that legal title did exist in plaintiffs on March 15, 1875, and that the acts of the life tenant were not such as to give them notice that he was claiming adversely to them prior to the execution of the deed to his second wife and daughters, surely executing and recording that deed was sufficient for that purpose. In it the grantor did not convey his life estate but reserved use and control of the property so long as he lived, so that the remainder in fee was all that he did convey. This was a solemn declaration that he was not holding as tenant by curtesy, but that he was claiming to own the fee (presumably under the deed in controversy). This constituted a hostile claim and gave rise to a cause of action. Adverse possession began at that time, and as it continued for more than fifteen years after that

deed was recorded before this suit was filed such possession ripened into title and this suit was barred by the fifteen year statute of limitation, unless by reason of some trust such statute would not apply.

There was no claim of any express trust, and we can only consider as to whether there was a resulting or constructive trust.

Our statute abolishes resulting trusts except (a) "In a case where the grantee takes the deed to himself without the consent of the one paying the consideration, or (b) where the grantee in violation of some trust shall have purchased the lands deeded with the effects of another person." Ky. Statutes, section 2353.

Aside from this form of a resulting trust, which is now regarded as synonymous with a constructive trust, it might be said that if Johnathan Webb entered under the claim of his wife, and thereafter paid all or part of the purchase price due thereon, and as a tenant by curtesy took the conveyance to himself, his title would inure to the benefit of the remainderman, subject to his right to reimbursement for the amount so paid. Spurlock v. Spurlock, 161 Ky. 248; section 214 Ky. Statutes. But none of these matters is pleaded in this case. The petition makes no mention of the deed from John Martin to Johnathan Webb, but it is relied upon in the answer, wherein it is fully set out, together with the recital that it was made "In consideration of the title bond executed by Joe Gearheart to Johnathan Webb on the 20th day of March, 1860," and a copy of it is filed and made a part of that pleading.

The reply denies the execution of the title bond or that the deed was made in consideration of it, but does not deny the execution of the deed or contain any affirmative plea in avoidance of it, hence it cannot be said that these matters are put in issue. The necessity of a plea to raise questions of this character is thus stated in vol. 31 Cyc.: "It is a well settled principle that no proof can be offered of matters not put in issue by the pleadings" (page 680), and "Under the code system of pleading new matters of avoidance or defense cannot be given in evidence under a general denial, but it must be specially pleaded" (page 693).

The text is fully supported by the following Ky. authorities: Boling v. Donegay, 1 Duv. 220; Phoenix Ins. Co. v. Lawrence, 4 Met. 9; L. & N. R. R. Co. v. Tarter,

39 S. W. 698; Taylor v. Combs, 50 S. W. 64; Perry v. Evans, 89 S. W. 12; Denton v. Logan, 60 Ky. 434; Crouch v. Mason, 199 Ky. 371.

The wisdom of the code provisions requiring the parties to plead to an issue is well illustrated in this case. If appellees had pleaded in avoidance of the deed this would have afforded appellants an opportunity to have pleaded the various statutes of limitation in bar of such relief. It is true that those statutes would not ordinarily run against the remaindermen in a suit to recover possession of the property, but it has been specifically held that in a suit attacking a deed seeking reformation or to have it declared a trust the statute may run. Treadway v. Pharris, 90 Ky. 663; Com. v. Clark, 119 Ky. 85, 83 S. W. 100; 9 L. R. A. (N. S.) 750; Alley v. Alley, 91 S. W. 291.

In this case the Martin deed conveyed a fee simple title and contained a recital of the consideration, which contradicted plaintiff's claim. This deed was recorded on the 10th day of July, 1875. The youngest child became of age in 1893, twenty-six years before the filing of this action. Again in 1904, after all of the children were of age, the testator conveyed this land to the defendants, reserving the control of it during his life. He thus did not convey his title as tenant by curtesy, and this conveyance is an absolute renunciation of any claim of appellees. If his former conduct was not a repudiation of any trust, unquestionably this was notice of that fact to appellees and a suit could have been brought at that time to have reformed the original deed. The statutes of limitation applicable to such matters could not be relied upon by the appellants in this case under the state of pleadings, and it is possible that this is a reason why appellees omitted such pleadings. Whatever may be the reason for the rule it is extremely doubtful if any evidence is admissible on this issue as presented. But if the technical points are passed and the evidence considered, the deed is 47 years of age and free from suspicion, and would prove itself under the ancient document rule if attacked. 27 C. J. 1165-6; Everidge v. Martin, 164 Ky. 497; Hyde Park Supply Co. v. Peck Williamson, 176 Ky. 513.

Without again reiterating the evidence we might say that if it be sufficient to raise the inference that Thomas Osborne contracted for and paid something on the land

and delivered possession thereof to his daughter it does not preponderate over or even equal the evidence recited above in behalf of appellants' claim, while the rule is "that a constructive trust cannot be established by the mere preponderance of evidence, but must be established by evidence which is clear, definite, unequivocal and satisfactory. 39 Cyc. 192; May v. May, 161 Ky. 114; Poole v. Thomas, 10 R. 92; Fonshee v. Fonshee, 163 Ky. 524; Neel's v. Noland, 166 Ky. 455; Nelson v. Nelson, 96 S. W. 794; Fitzpatrick v. Roark, 179 Ky. 504; Holtzclaw v. Wills, 166 Ky. 353; Aker, &c. v. Henry Clay Oil Co., et al., 196 Ky. 508. Indeed all the evidence is consistent with the theory that the deed was so executed with the consent of the one paying the consideration. We conclude that if the evidence could have been considered it was insufficient to establish a constructive trust.

The evidence as to the mental incapacity of Johnathan Webb at the time of the execution of the deed of August, 1904, is still weaker. It is shown that he worked on his farm and looked after his business to a greater or less extent up to a short time before his death, and while exhibiting some of the weaknesses of old age, he retained his mental vigor in a remarkable degree; that at his request the sheriff came to see him and collected his taxes a short time before his death, and at that time he was able to remember how the amount of his tax receipt compared with that of the previous year. The deed was executed fifteen years before his death, and at that time he rode alone from his home to Prestonsburg, a distance of over fifteen miles, went to the clerk's office and requested the clerk, who was a competent scrivener, to draw the deed, which he himself dictated. There was an attorney present at the time who heard the dictation and witnessed the signature. Both he and the clerk testify as to his capacity and mental vigor at that time, and this is corroborated by the statements of a large number of witnesses who had business dealings with him at the time and extending up to his death, all of whom testify that he was mentally capable and gave reasons for their conclusions.

Only three or four witnesses testify to the contrary. One of these a son, one a brother of deceased, and the fourth a son-in-law. These state that he was mentally incapable of transacting business. However, the first admits that he borrowed $1,000.00 from him during that

period, and that his father continued to transact his business, and bought and sold property generally. The second witness confines his evidence to the last eight or ten years, and states no facts upon which to base his conclusions, but thinks Jemima Webb had influence over him. The brother noticed a change twenty years before his brother's death, and did not think he was capable of taking care of himself, but it is shown that within that period he had called upon Johnathan Webb to testify in a lawsuit for him, and his deposition is produced. The fourth, a son-in-law of plaintiff, claims that at times Mr. Webb would not know him, but this was within the last eight or ten years. Only one other witness testifies as to mental incapacity. He refers to a transaction with Webb about eight years subsequent to the execution of the deed, and the facts he recites negative his conclusions, even if competent in point of time.

We are mindful of the rule that where the circumstances show a confidential relation between the parties and a deed without valuable consideration is made by one who is aged and infirm and living with the grantee, the burden is upon the latter to show the *bona fides* of the transaction, and for this reason have considered this evidence carefully, but conclude that the evidence as to the mental capacity of Johnathan Webb at the time is beyond doubt. It is further indicated that he intended the deed of August 7, 1904, and the one in question as a settlement among his children and that this was in accordance with a fixed purpose of his own, and that no undue influence is shown. It may be that the advance in value of these lands has rendered the division unequal, but that cannot be considered as affecting the validity of the deed in question, and as to this we entertain no doubt.

Wherefore judgment is reversed and cause remanded for proceedings consistent with this opinion.