COMMERCIAL BUILDING COMPANY, A CORPORATION, *Appellant*, v. FREDERICK D. PARSLOW, JOSEPH G. PARSLOW, PAUL I. PARSLOW, BEATRICE P. BOWER, CHRISTINE M. REID, EUPHEMIA M. PALLARDY, HELEN M. KERNAN AND FELICE CLARK, *Appellees*.

En Banc.

Opinion Filed January 21, 1927.

Petition for Rehearing Denied March 15, 1927.

1. The general rule is that neither laches, estoppel nor the statute of limitations will run against a remainderman

prior to the termination of the life tenancy. This rule is, however, predicated on an uninterrupted continuation of the conduct of the life tenant consistent with his duty as such to the remainderman.

2. The rule may not apply where it is shown that the remainderman had actual knowledge of the repudiation or abandonment by the life tenant of his status as such, and of the holding by him of the property under a different and adverse right, or where the life tenant in good faith and to the knowledge of the remainderman claims title, not as a life tenant, but through some other source, or where there has been ouster and disseisen of the life tenant or by one claiming through or under him, and this under claim of right or color of title followed by adverse possession for the statutory period, or when there is some special independent equity in favor of the purchaser who claims under a conveyance from the life tenant.

3. A remainderman may at any seasonable time before or after the death of the life tenant bring a suit in chancery to have his title quieted or determined.

4. A remainderman who neglects unduly to go into a court of equity and disaffirm the sale made by a trustee in contravention of a trust or to have the purchase price sequestered for his benefit will be barred from doing so by laches. The like rule applies to a remainderman, who through fraud or deceit, is induced to part with his remainder pending the life estate.

5. Estoppel is effective against a remainderman when he commits some act with reference to the life estate whereby he derives a personal benefit or prejudices the rights of others interested therein. Such, for instance, as aiding the sale of the life estate and participating in the proceeds of such sale.

6. A remainder is defined as an estate limited to take effect in possession immediately after the expiration of a prior estate created at the same time and by the same instrument.

7. A vested remainder such as we are dealing with here is a species of property in which the present estate or interest passes to the beneficiary with the right of enjoyment suspended to some future date.

8. Where the life tenant has abandoned or repudiated his status as such, and holds the property under a different and adverse right, or where the life tenant in good faith and to the knowledge of the remainderman claims title not as life tenant, but through some other source, or where there has been ouster and disseisen of the life tenant or one claiming by, through or under him, and this by claim of right or color of title followed by adverse possession for the statutory period, or where there is some special independent equity in favor of the purchaser who claims under the conveyances from the life tenant, then and under such circumstances the life tenancy has in effect as completely fallen in and been terminated as if the life tenant had died.

9. A void will or a void deed may be sufficient basis for color of title to support adverse possession.

10. Infants not being *sui juris*, neither laches nor the statute of limitations will run against them unless it has already commenced to run against the ancestor.

11. At the common law a married woman under coverture could not be guilty of laches, but in equity in respect to her separate property she is in every respect a *feme sole.*

12. Under our statute a married woman may have the disability of coverture removed and manage her own estate, contract and be contracted with, sue and be sued, and bind herself in all respects as fully as if she were unmarried. She may then convey her separate real estate by her sole deed, the husband not being required by law to join in the conveyance.

13. A married woman's relinquishment of her dower and execution of a deed to her separate property, provided her husband join her, is good notwithstanding her minority at the time of execution.

14. The disability of coverture as to a married woman's sep-
arate property having to a certain extent been removed, to a
like extent the statute of limitations as to her would begin to
run from coverture if that accrued prior to attaining her
majority.

An Appeal from the Circuit Court for Hillsborough
County; L. L. Parks, Judge.

Affirmed in part;

Reversed in part.

*W. Raleigh Petteway* and *D. C. McMullen,* for Appellant;

*Thos. E. Lucas, Jas. F. Glen* and *Whitaker, Himes &*
*Whitaker,* for Appellees.

Terrell, J.—This suit was brought by appellees in the
Court below for the purpose of obtaining a decree adjudg-
ing Lot 4 of Block 46, General Map of Tampa, Public Rec-
ords of Hillsborough County, Florida, to be the homestead
of Domineco Ghira, the head of a family residing in this
State at the time of his death; that at the death of the
said Domineco Ghira an undivided one-fourth interest in
said Lot 4 vested in his son, Francis J. Ghira; that pursu-
ant to the will of Francis J. Ghira at the death of his
mother, Dominga Ghira, and his sister, Euphemia Ghira
(now Euphemia Kelliher) the said undivided one-fourth
interest was devised in fee simple to the children of his two
sisters, Josephine Parslow and Flora G. Mahoney, and the
children of Euphemia Kelliher, should there be any living
at her death, and to quiet the title of appellees in and to
said undivided one-fourth interest in said Lot 4 as against
appellant or any one claiming by, through or under it.

The facts on which it is proposed to rest such a decree

are shown by the record to be substantially as follows: Domineco Ghira was at the time of his death, May 22, 1897, the head of a family, residing on Lot 4, Block 46, General Map of Tampa, Fla., as his homestead.   He left surviving him his wife, Dominga Ghira and four children.   Two of the children, Euphemia and Francis J., were living on the homestead with the father at his death, and the other two, Josephine Parslow and Flora G. Mahoney, the mothers of appellees, had married and were living to themselves. Domineco Ghira and Francis J. Ghira both died testate.   Domineco Ghira died May 22, 1897, leaving a will dated January 21st, 1891, in which he devised all his real and personal property to his wife for life, to use and control as she pleased, and at her death devised his entire estate to his four children, designating specific parcels by description to each child.   In the devise to Euphemia, among other parcels, the homestead was described.   Francis J. Ghira died June 10, 1897, less than three weeks after his father, leaving a will dated June 5th, 1897, in which he devised all real and personal property possessed by him at his death to his mother for life, and at her death to his sister Euphemia for life, and at her death the remainder to the children of his sisters, Josephine Parslow and Flora G. Mahoney, provided that in the event Euphemia should leave children at her death, then in that event her children should share equally with the children of Josephine and Flora.   In the will of Domineco Ghira, his wife, Dominga Ghira, and his son, Francis J., were named executors.   In the will of Francis J. Ghira his sister Euphemia was named executrix.

After the death of Domineco Ghira, his wife, Dominga Ghira, went into possession of the homestead under the will, and continued to reside there until her death in 1900. Francis J. lived with his mother on the homestead till his death, and Euphemia lived there with her mother till her

mother's death, and immediately thereafter went into pos-
session of the homestead under the terms of her father's
will.   The record in fact discloses that the mother and all
the children accepted the provisions of the father's will,
took as per its terms, and at no time raised any question as
to the distribution under it.   Euphemia continued to
occupy the homestead for a short time, when she moved
away, but continued to rent it and appropriate the rents
to her use till March 14, 1910, when she sold and deeded it to
L. Horn, G. A. Petteway, D. C. McMullen and M. W. Ul-
mer.   In the meantime she asserted her ownership of it,
it had been assessed in her name and she had paid all
State, county and municipal taxes and special assessments
against it.   On February 17th, 1910, Josephine Parslow and
Flora G. Mahoney, as heirs at law of Domineco Ghira and
Francis J. Ghira quit-claimed all their right and interest
in said homestead to her, and in 1907, she prosecuted to
final decree a suit to quiet her title in and to it.   None of
the appellees were, however, made parties defendant to the
suit to quiet title.   It is also shown that for the purpose of
perfecting her record title she induced the heirs of James
P. B. Haskins, the vendor of Domineco Ghira to quit-claim
all their right and interest in and to the said homestead to
her.   June 8, 1910, L. Horn, G. A. Petteway, M. W. Ulmer
and D. C. McMullen, each joined by his wife, deeded the
said homestead to the appellant, Commercial Building Com-
pany, a Florida Corporation.   In making the sale of this
property to Messrs. Horn, Petteway, McMullen and Ulmer,
Mrs. Parslow and her son, Joseph G. Parslow, one of the
appellees, acted as the agent of Mrs. Kelliher.   Instruments
evidencing all the foregoing transactions were of record in
due course.

When the Commercial Building Company acquired the
property it removed the old building therefrom imme-

diately and put up its sign advertising to the public that it claimed title to it. At approximately the same time the local papers repeatedly carried stories to the effect that G. A. Petteway and associates had acquired the Ghira homestead and would soon commence the erection of a ten story office building on the property. These stories gave a general description of the building, announced that its cost would be not less than Three Hundred Thousand Dollars ($300,000.00), modern in every respect, and that it would be ready for occupancy not later than January 1st, 1911. The ten-story office building turned out to be a two-story one covering the entire lot, was promptly completed at a cost of Twenty-five Thousand Dollars ($25,-000.00), now valued at more than Sixty Thousand .($60,-000.00), and since its completion has borne the name ''Petteway Building'' in large letters across the front, has been known locally since completion as the ''Petteway Building'' and was owned and operated by appellant more than fourteen years prior to the bringing of this suit. The record also shows that appellees were born and reared in three blocks of this property and have lived most all their lives in its vicinity, had knowledge of the deeds and changes herein defined, and at the time of filing their bill in this case their ages were from twenty-six to forty.

On the basis of the foregoing facts appellees, who were complainants below, contend that the will of Domineco Ghira was void as to his homestead; that the said homestead under the law of this State (Section 3620, Revised General Statutes, 1920,) descended to his heirs, and that Mrs. Kelliher took an undivided one-fourth interest therein, that by the quit-claim deed from her sisters, Mrs. Parslow and Mrs. Mahoney, she acquired their two-fourths interest, and that by virtue of the will of her brother Francis J. under which she qualified as executrix, she took an estate for life

after the death of her mother in the remaining one-fourth interest with the remainder in that one-fourth interest to the children of her two sisters, Mrs. Parslow and Mrs. Mahoney.

Against the contention of appellees, the appellant, who was defendant below, concedes the invalidity of the will of Domineco Ghira as to his homestead, but contends that in addition to the deed from Mrs. Kelliher its title to the homestead is good by adverse possession, and that any claim on the part of the appellees is now stale and barred by laches.

On final hearing the Chancellor decreed that Domineco Ghira was at the time of his death the head of a family residing in this State, that Lot Four of Block Forty-six, general map of Tampa was his homestead, that upon his death an undivided one-fourth interest in said homestead vested in his son Francis J. Ghira, and that under the will of the said Francis J. Ghira at the death of his mother, Dominga Ghira, and his sister Euphemia Kelliher (nee Ghira), the said undivided one-fourth interest was devised in fee simple to the children of Josephine Parslow and Flora G. Mahoney, together with any children said Euphemia Kelliher might leave at her death, that the said children took a vested remainder in the said undivided one-fourth interest, and that upon the determination of the life estate of Euphemia Kelliher the Court decreed that their title in and to the said undivided one-fourth interest be quieted against the defendant or any one claiming by, through or under it, except the proportionate part of Joseph G. Parslow, as to which the said Joseph G. Parslow was barred and estopped from claiming any interest therein and title thereto was quieted in appellant against Joseph G. Parslow or any one claiming by, through or under him.

Out of the foregoing facts the first question presented

for our solution is wheather or not laches or estoppel or the statute of limitations will run against a remainderman prior to the termination of the life estate, and if so, under what circumstances will they do so.

The general rule is that laches, estoppel nor the statute of limitations will run against a remainderman prior to the termination of the life tenancy. This rule is, however, predicated or an uninterrupted continuation of the conduct of the life tenant consistent with his duty as such to the remainderman. The rule may not apply where it is shown that the remainderman had actual knowledge of the repudiation or abandoment by the life tenant of his status as such, and of the holding by him of the property under a different and adverse right or where the life tenant in good faith and to the knowledge of the remainderman claims title, not as a life tenant, but through some other source, or where there has been ouster and disseisin of the life tenant or by one claiming by, through or under him, and this under claim of right or color of title followed by adverse possession for the statutory period, or when there is some special independent equity in favor of the purchaser who claims under a conveyance from the life tenant. Anderson v. Northrop, 30 Fla. 612, 12 South. Rep. 318; Scott v. Fairlie, 81 Fla. 438, 89 South. Rep. 128; Fairlie v. Scott, 88 Fla 229, 102 South Rep. 247; 23 R. C. L. 591; Crawford v. Meis, 123 Iowa 610, 99 N. W. Rep. 186, 66 L. R. A. 154; Robinson v. Pierce, 118 Ala. 273, 24 South. Rep. 984.

Some states have enacted statutes purposely extending the statute of limitations to run against remaindermen in fovor of tenants for life and those holding title under them after knowledge is brought home to the remainderman that the person in possession may be claiming title hostile to the reminderman. Such statutes also authorize the

remainderman to bring action to have their rights and interests determined and their title quieted; but we think that in the absence of such statutes a remainderman may at any seasonable time before or after the death of the life tenant bring an action in chancery to have his title quieted or determined. 3 Pomeroy's Eq. Juris. (4th ed.) 1220, 1398, 1399; Aiken v. Suttle, 4 Lea (Tenn.) 103; Cantrell v. County of Davidson, 3 Tenn. Ch. 426; Woodstock Iron Co. v. Fullenwider, 87 Ala. 584, 6 South. Rep. 197; Lansden v. Bone, 90 Ala. 446, 8 South. Rep. 65; Robinson v. Pierce, 118 Ala. 273, 24 South. Rep. 984, 45 L. R. A. 66; Pryor v. Winter, 147 Cal. 554, 82 Pac. Rep. 202, 109 Am. St. Rep. 162, Note 168; Winters v. Powell, 180 Ala. 425, 61 South. Rep. 96.

It cannot be questioned that the remandermen in the instant case recognize this last enunciation to be well grounded in law, as this suit was brought by them during the life of the life tenant for the purpose of having their title determined and quieted. It necessarily follows that they realize that conditions may arise in which laches or the statute of limitations will run against them as remaindermen; otherwise they would have waited till the death of the life tenant to bring this suit.

Robinson v. Pierce, *supra,* is one of the strongest and best reasoned cases we have found in which laches was imputed to a remainderman. In that case a trustee executed a deed to a third person in contravention of a trust. The remainderman had a right to go into a court of equity and disaffirm the sale or have the purchase price sequestered for his benefit; but failing to do this for an undue period, during all of which the life tenant still lived, his right was held to be barred on account of the staleness of his demand. The same rule would apply to one who through fraud or deceit was induced to part with his remainder

pending the life estate if he fails unduly to repudiate the transaction or neglects to file a bill in chancery for recision and restoration of his estate. 23 R. C. L. 589.

Estoppel is effective against a remainderman when he commits some act with reference to the life estate whereby he derives a personal benefit or prejudices the rights of others interested therein. Such, for instance, as aiding the sale of the life estate and participating in the proceeds of such sale. 23 R. C. L. 590.

In Myers v. Adler, 6 Mackey (D. C.) 515 1 L. R. A. 432, a remainder is defined as an estate limited to take effect in possession immediately after the expiration of a prior estate created at the same time and by the same instrument. A vested remainder such as we are dealing with here is a species of property in which the present estate or interest passes to the beneficiary with the right of enjoyment suspended to some future date. In the preparation of this opinion we have read a great many cases and have analyzed what the text-writers have to say on the subject, but we have found no reason, nor have we been cited to any, nor can we conceive of one why remaindermen are not charged with the same care and diligence to preserve and protect their titles from assault and appropriation by third parties that other owners and claimants are charged with. A remainderman is the recipient of his benefactor's bounty, the favored donee of his doner and in fact from most any angle considered he is the appointed beneficiary of someone's benevolence; but this in law does not relieve him from protecting the title to the subject of his bounty when it is assailed and he is *sui juris*.

In announcing this as the law we are fully conscious of the general rule to the effect that neither laches nor the statute of limitations will run against a remainderman until the termination of the life estate, or as some writers

say, till the life estate falls in.  We recognize both the rule and the exceptions or qualifications to it, but where the life tenant has abondoned or repudiated his status as such, and holds the property under a different and adverse right, or where the life tenant in good faith and to the knowledge of the remainderman claims title not as life tenant, but through some other sources, or where there has been ouster and disseisin of the life tenant or one claiming by, through or under him, and this by claim of right or color of title followed by adverse possession for the statutory period, or where there is some special independent equity in favor of the purchaser who claims under conveyance from the life tenant, then and under such circumstances the life tenancy has in effect as completely fallen in and been terminated as if the life tenant had died.

No branch of the law presents more complicated or difficult situations than that affecting remaindermen and their legal relations to the life tenant and the remainder. Such complicated and difficult situations can be construed as nothing more than incidents that must flow from the transactions of our changing society.  It was the want of flexibility in the common law to meet such exigencies that gave rise to the equitable jurisdiction of the court of chancery, and while its scope has been enlarged from time to time no code of positive law has yet been devised to meet all the demands of remedial justice without a resort to natural principles to assist interpretation and application. 10 R. C. L. 257. Studied historically it is readily apparent that every qualification herein announced to the rule that the statute of limitations will not begin to run against the remainderman till the termination of the life estate was imposed in an effort to adjust the law to the complicated transactions of our social order.  We deem the qualifications to the rule to be as fundamentally right and sound

as the rule itself, and whether or not a case falls within the rule or one of its qualifications, must be arrived at by the law of judicial inclusion and exclusion as the facts of the particular case presented may disclose.

Under our system of jurisprudence the rules of property defined by legislative enactment bear an infinitely small proportion to those defined by what we may term the American common law which is the product of judicial interpretation. ''New combinations of facts are constantly arising and producing new questions of law; the determination of each of these may be considered a new law, for it lays down a rule to be followed in time to come.''

This case must therefore turn on the question of whether or not the facts presented place it within the general rule as to limitations against remaindermen of some of the well recognized exceptions to the general rule.

The record shows conclusively that Mrs. Kelliher, the life tenant, claimed title to the homestead solely under the terms of her father's will, and held it by virture of that instrument up to the time she sold it to the predecessors in title of appellant, and while the will was void as to the homestead a void will or a void deed may be sufficient basis for color of- title to support adverse possession. Carn. v. Haisley, 22 Fla. 317; Gilbert v. Southern Land & Timber Co., 53 Fla 319, 43 South. Rep. 754; 1 R. C. L. 711.

Conceding that Mrs. Kelliher in law went into possession of the homestead as a life tenant, it is clear that her conduct in its administration from the beginning was wholly inconsistent with, and was equivalent to a renunciation and abandonment of any claim as life tenant. The main considerations evidencing her renunciation of the life tenancy were the prosecution by her of the suit to final decree to quiet her title, securing a quit-claim from the Haskins' heirs to perfect her record title, the sale of the

property in good faith at its fair market value by fee simple to Horn, McMullen, Petteway and Ulmer, the sale being accomplished through Joseph G. Parslow, one of the appellees, and his mother acting as the agent of Mrs. Kelliher, and lastly the sale to appellants and properly recording all instruments verifying these transactions.

We think there can be no doubt that clear proof and actual notice of these facts was brought home to the appellees. In addition to the recorded instruments the record discloses that immediately after Mr. Petteway and his associates acquired the property they went into possession, removed the old buildings and announced to the world that they had acquired the Ghira homestead and would within sixty days commence the errection thereon of a ten-story office building to cost Three Hundred Thousand Dollars, and that when completed it would be the finest if its kind in the State. The location, dimensions, general design, cost, purpose and accessibility of the building was repeatedly announced through the press, it was discussed generally, ground was broken and work was commenced on it at once. The reputed ten-story building at a cost of $300,000.00 materialized into a two-story one at a cost of Twenty-five Thousand Dollars, which during the period of construction and ever since has been known locally as the ''Petteway Building.'' The record further discloses that appellees were born and have lived practically all their lives in Tampa within a few blocks of this property, that it was just across the street from the Post Office, was one of the best located properties in Tampa, that it was generally understood locally to be the property of Mrs. Kelliher, and that Joseph G. Parslow, one of the appellees, and Mrs. Parslow and Mrs. Mahoney, the mother of all of them, had always considered and represented it to be the property of Mrs. Kelliher. The deed from Mrs. Kelliher to

Petteway and associates and the deed from Petteway and associates to appellant show on their face to be warranty deeds conveying a fee simple interest to the whole of the premises described. Some of these facts are admitted by appellees, and none of them are contradicated.

This suit was brought in the court below by appellees to have the will of Francis J. Ghira interpreted, to have a judicial determination of their rights thereunder and to have their title as remaindermen quieted in and to a one-fourth interest in the Ghira homestead. They have shown no impediment whatever to an earlier prosecution of their claim. They could not plead ignorance because both the will of Francis J. Ghira and that of his father, Dominee Ghira, were duly probated, deeds of conveyance and other instruments affecting the title were of record, they were born in three blocks of the property, had lived practically all their lives in its immediate vicinity, were from twenty-six to forty years old at the time of the institution of this suit, admit their knowledge of the sale by Mrs. Kelliher to appellant and its predecessors in title, and were bound to have had knowledge of the changes and improvements in the property made by appellant, and that such changes and improvements were expensive. With knowledge of all these facts they have waited more than fourteen years after the sale to appellant to assert their claim, during which time the property had greatly increased in value, and they have seen appellant spend large sums in its better-ment. If this state of facts was not sufficient to apprise appellees that Mrs. Kelliher was asserting a title hostile to theirs, then it would be difficult to conceive one that would. We think that while Mrs. Kelliher's conduct from her mother's death was inconsistent with that of a life tenant, knowledge of her adverse holding was certainly brought home to appellees by the sale to appellant and its

predecessors and their handling of the property. Twin-Lick Oil Co. v. Marbury, 91 U. S. 587; Castner v. Walrod, 83 Ill. 171; Bliss v. Pritchard, 67 Mo. 181; Gibson v. Herriott, 55 Ark. 85, 17 S. W. Rep. 589; 21 C. J. 193; Van Matre v. Swank, 147 Wis, 93, 131 N. W. Rep. 982; Webb v. Webb, 200 Ky. 488, 255 S. W. Rep. 137; Pooler v. Hyne, 213 Fed. Rep. 154; Breland v. O' Neal, 88 Miss. 449, 40 South Rep. 865; Gindrat v. Western Ry. of Ala., 19 L. R. A. note.

It is insisted by appellant that at the time this suit was instituted one of the appellees had not been in her majority for seven years, but that no plea of infancy having been interposed, no advantage can accure to appellees from this fact. It is true that no plea of infancy was interposed, but the record shows the birth of each appellee, consequently the age of each. The record further shows the two youngest appellees to be *feme coverts* It is true that infants not being *sui juris,* neither laches nor the statute of limitationss will run against them unless it has already commenced to run against the ancestors. Futch v. Parslow, 64 Fla. 279, 60 South. Rep. 343.

In this case neither laches nor limitation can be imputed to the ancestor, but as to all *feme coverts* the right to the property involved was their separate property, and this fact may determine the time the statute of limitations begins to run against them. At the common law a married woman under coverture could not be guilty of laches, but in equity in respect to her separate property she is in every respect a *feme sole.* Under Article 12 of our Constitution her real and personal property acquired by gift, bequest, descent or purchase is her separate property, not subject to the debts of her husband without her consent in writing and may be disposed of by her in any manner that she may elect provided her husband join in the conveyance.

"A married woman's separate real or personal property may be charged in equity and sold, or the uses, rents and profits thereof sequestered for the purchase money thereof; or for money or thing due upon any agreement made by her in writing for the benefit of her seperate property; or for the price of any property purchased by her, or for labor and material used with her knowledge or assent in the construction of buildings, or repairs, or improvements upon her property, or for agricultural or other labor bestowed thereon, with her knowledge and consent." Under our statute she may have the disability of coverture removed and manage her own estate, contract and be contracted with, sue and be sued, and bind herself in all respects as fully as if she were unmarried. She may then convey her separate real estate by her sole deed, the husband not being required by law to join in the conveyance. Sec. 3118 *et seq.*, Rev. Gen. Stats. 1920; Lerch v. Barnes, 61 Fla. 672, 54 South. Rep. 763. Her relinquishment of dower in any sale or execution of a deed to her separate property provided her husband join her, is good notwithstanding her minority at the time of execution. The disability of coverture in respect to her separate property having to such extent been removed, she is to a like extent relieved of its consequences. Burkle v. Levy, 70 Cal. 250, 11 Pac. Rep. 643; Lewis v. Barber, 21 Ill. App. 638, text 641; Steines v. Manhattan Life Ins. Co., 34 Fed. Rep. 441, text 444; Gibson v. Herriott, 55 Ark. 85, 17 S. W. Rep. 589.

We are therefore of the opinion that from the time Mrs. Kelliher went into possession of the homestead on the death of her mother, in 1900, she abandoned and renounced any claim she may have had therein as a life tenant and held adversely to the remaindermen; that from the time of the sale to Petteway and associates in 1910, the remain-

dermen had actual knowledge of Mrs. Kelliher's adverse claim; that as to appellees Beatrice Parslow, Joseph Parslow, Fredrick Parslow, Paul Parslow, Felice Mahoney and Christine Mahoney, the record shows that they had attained their majority more than seven years before the filing of this suit and are therefore barred by the staute of limitations to any claim or right they may have had in and to the said homestead; as to appellees Euphemia Mahoney and Helen Mahoney, the record shows that they had not attained their majority more than seven years before the filing of this suit, but it shows that at the time this suit was filed they were married women and any right of theirs in the homestead was under our Constitution their separate property, and this being the case, the statute of limitation as to them would begin to run from coverture if that accrued prior to attaining their majority.

The decree of the Chancellor is therefore affirmed as to Joseph G. Parslow; otherwise it is reversed with instructions to enter final decree in compliance with this option.

Affirmed in part;

Reversed in part.

STRUM, BROWN AND BUFORD, J. J., concur.

ELLIS, C. J., dissents.