59 So.2d 751 (1952)
FLORIDA NAT. BANK OF JACKSONVILLE et al.
v.
SIMPSON.
Supreme Court of Florida, en Banc.
May 9, 1952.
*753 Adair, Kent, Ashby & McNatt, Jacksonville, for appellants.
Richard W. Ervin, Atty. Gen., Fred M. Burns and T. Paine Kelly, Asst. Attys. Gen., and J. Henry Blount, Jacksonville, for appellee.
HOBSON, Justice.
On April 29, 1935, Alfred I. duPont died testate. At the time of his death he was domiciled in, and was a resident and citizen of, Duval County, Florida. In and by his last will and testament (with two codicils) Mr. duPont provided for a trust fund, naming as Trustees thereof the Florida National Bank of Jacksonville, Jessie Ball duPont (his widow), a resident of Duval County, Florida, Edward Ball, also a resident of Duval County, Florida, and Elbert Dent, a resident of Greenville, Delaware.
The aforementioned Trustees filed three suits in equity against Clyde H. Simpson as Tax Collector of Duval County, Florida, wherein they sought to determine the legality, equality and validity of the Florida intangible personal property taxes assessed against the complainants as Trustees under the will of the late Alfred I. duPont. They further sought to set aside taxes which had been so assessed, or such part thereof as might be determined to be contrary to law.
After the filing of amended bills of complaint the defendant answered. Subsequently, Honorable Bayard B. Shields, Circuit Judge, heard and determined the issues. These three appeals and cross-appeals are from the three final decrees entered by the Chancellor. All three appeals have been consolidated and we will endeavor to dispose of all questions raised, in and by this single opinion.
The learned Chancellor decreed, in substance, that certain back assessments which were made by the tax assessor in the year 1945 for the years 1941, 1942 and 1943, and the assessments for the years 1944, 1945 and 1946 were authorized by law, were valid and should stand as made. He further determined that a bequest to charity in perpetuity of the net income of the testamentary trust (subject to annuities) did not immediately upon the death of Mr. duPont create in favor of, or vest in, the charitable association (Nemours Foundation) an equitable, beneficial interest in the trust res which would exempt the entire corpus of the trust held and owned by the Trustees from the intangible personal property tax levied against it. The Chancellor also decided that when Mrs. duPont irrevocably assigned 12% of the residue net income from the trust property to Nemours Foundation, as she was authorized to do by Mr. duPont's will,[1] *754 said Foundation at that time became vested with such an equitable, beneficial interest in the trust res as would entitle the Trustees to a declaration of exemption from taxation of that part of the intangible personal property which is proportionate to the whole thereof as 12% of the residue of the net income of the Trust Estate is proportionate to the whole of said net income. The effect of this ruling was to allow an exemption from taxation to the Trustees because the Chancellor was of the opinion that the irrevocable assignment of 12% of the residue of the net income operated, to such extent, to create in the Foundation, a charitable association, an equitable, beneficial interest in the trust res itself. This ruling was made in the face of the fact that the corpus of the trust is owned by the Trustees, is subject to their exclusive control and management and is in their custody in the State of Florida which is the situs of the trust res for the purpose of taxation. It is deemed appropriate to remark at this stage that no one contends if there were an attempt to tax the interest of Nemours Foundation, whatever it may be, but that it would be exempt because it would be a species of property "belonging to" a charitable association in this State or it would be in the nature of an interest in income and non-taxable by reason of our Constitutional prohibition against an income tax, or the 1943 amendment of Section 199.02, F.S. 1941, F.S.A., would exempt it.
The veteran Chancellor further decided that the tax assessor in fixing the value of the corpus of the trust, which consists of more than two hundred thousand shares of the common capital stock of E.I. duPont de Nemours & Company, was right in not allowing to the Trustees what is commonly known as a "blockage discount" and that he was justified in fixing the value of the stock at the same price per share as the price per share which similar stock brought when sold on the New York Stock Exchange on December 31st of the year preceding the next taxable year beginning January 1st. Finally, it was decreed that one-fourth of the trust res was, and is, not immune from the Florida intangible personal property tax because one of the four testamentary Trustees is a non-resident of Florida.
The appellants contend that the Chancellor committed error in making the rulings which we have hereinbefore delineated, except in decreeing an exemption from taxation in favor of the Trustees on account of the 12% interest in the residue of the net income which was irrevocably assigned to Nemours Foundation by Mrs. duPont. On the other hand, counsel for appellee hold the view that the Chancellor was correct in all matters except the aforementioned allowance of the 12% exemption to the Trustees.
For the purposes of this opinion we deem it necessary only to state that in and by his last will and testament (with the exception of certain specific legacies and bequests not material here) Mr. duPont left all of his estate to his Trustees with directions to collect the income and distribute the net income in the following manner:
(1) $200,000 annually to his widow, Jessie Ball duPont, during her lifetime; (2) $75,000 annually to other named beneficiaries during their respective lives; (3) the residue and remainder of the net income to the said Jessie Ball duPont during her lifetime; and (4) after the termination of said life estates all of said net income to the Nemours Foundation, a charitable corporation to be formed in accordance with directions contained in the will for the charitable uses and purposes detailed by the testator in his will.
None of the beneficiaries or annuitants was given any power of appointment of *755 the corpus or any right of possession, control or ownership of the trust res, with the single exception that the will permitted and authorized Mrs. duPont to create the charitable corporation in her lifetime and to require the Trustees to pay over to said charitable foundation out of the principal of the trust any sums directed by her to be paid (not exceeding One Million Dollars) which were to be applied and expended in the erection and equipment of the buildings for the purposes of the Nemours Foundation. The Nemours Foundation was organized as a non-profit corporation under the laws of this State on February 26, 1936. On August 24, 1936, Mrs. duPont directed the Executors of the will to pay over to Nemours Foundation the sum of One Million Dollars out of the principal of the estate. Her directive was executed. At the same time she irrevocably assigned to Nemours Foundation 2% of her residuary life estate in and to the net income from the trust res. On a later date she assigned 10% thereof making a total assignment of 12% of her said interest in the residue of the net income. Parenthetically, we pause to observe that the will expressly prohibits each and every beneficiary from, in any manner, pledging, appropriating, disposing of or parting with by anticipation or before the same shall have accrued and become payable, his or its interest in the net income produced by the trust estate. As before noted, this proviso was decreed by the Circuit Court in and for Duval County, Florida, to be inapplicable to Mrs. duPont insofar as she had assigned a part of, or might assign any part of, her interest in the residuary net income to Nemours Foundation.
Appellants pose six questions for our consideration and determination. The first of these questions is stated by appellants in the following form:
"Where a taxpayer prepared his intangible tax return, correctly showing thereon all of his intangible personal property, and also correctly showing the price per share at which his listed stocks were quoted on the stock exchange on the critical date, and, before filing, discussed such return with the tax assessor and agreed with the tax assessor
"(i) upon the amount of `blockage discount' on a large block of stock, and
"(ii) upon the amount of charitable exemptions to be claimed by the taxpayer, and allowed by the assessor in the return,
and such return is filed by the taxpayer in accordance with such agreement, and the intangible tax assessed, and certified by the assessor to the County Commissioners, and certified by them to the collector, and duly paid by the taxpayer, all in accordance with such agreement, is it lawful for the assessor to `back-assess' the intangibles for three years or for any year next preceding such back-assessment, upon the directions or advice of the Comptroller and/or the Attorney General to do so, without himself reviewing or reconsidering the original assessment in the manner provided by Section 199.09, Florida Statutes 1941 [F.S.A.], and without himself making any findings that he had committed error in making the original assessment, resulting in material inequality with (discrimination against) other intangibles in like conditions (Root v. Wood, 155 Fla., [613] Text 624, 625, 21 So.2d 133) ?"
This question was answered in the affirmative by the trial court. Appellants contend that the answer should have been negative.
Counsel for appellants in preparing the foregoing question recognized our holding in Root v. Wood, supra, to the effect that the tax assessor might back-assess intangible personal property if he should determine within three years that such property was returned and assessed upon the basis of a valuation less than its full cash value. They insist that the back assessments in these cases were made by the tax assessor in a manner unauthorized by law and cite Root v. Wood, supra, in support of their position. At the same time they urge us to reconsider our decision in that case because "If the Root *756 case be construed to sanction the back-assessment of all intangibles which have been honestly valued and returned by the taxpayer and honestly valued by the Assessor, then there is no doubt that such construction of Section 31 of the 1941 Act, F.S.A., Section 199.29, is broader than that placed upon any of the many similar acts that had been construed by other courts of last resort." We have been moved, among other considerations, by Counsels' evident sincerity and earnestness, to reexamine the construction which we placed upon Section 199.29, in Root v. Wood, supra, and to analyze meticulously, as well as studiously reconsider as a whole, Chapter 199 F.S.A., 1941.
We are unable to follow the attempt made by counsel for appellants to differentiate the situation in the instant case from that which confronted us in the case of Root v. Wood, supra. Consequently, we are faced with the problem of adhering to or receding from that part of our opinion in said case wherein, in substance, we decided if it should be determined by the tax assessor that any intangible personal property was not returned at full cash value the differential between the value fixed in the taxpayer's return as accepted by the tax assessor and the full cash value of such intangible personal property represents a portion or part of the intangible which will be considered as having "escaped taxation" and be subject to back assessments within three years. In these cases the returns were accepted and the values reflected therein were not increased by the assessor as they could have been by virtue of Sections 199.09 and 199.10.
In Root v. Wood, supra, we offered no reason for giving to the words "escaped taxation" a connotation different from the customary, common usage meaning of said words. Upon a careful, studied reconsideration of Chapter 199, supra, in toto and in particular Section 199.29 thereof, we find nothing to indicate a legislative intent that the words "escaped taxation" should be given a strained construction or secondary meaning. Indeed, on the contrary, we find within the act itself convincing indicia that the legislative intent was that such words should be given their ordinary signification.
Section 199.29, supra, bears the title "Assessment of intangible personal property previously omitted." (Italics supplied.) The body of said Section contains the following pertinent language:
"If any tax assessor when making his assessment shall discover that any intangible personal property has for any reason escaped taxation for any or all of the three previous years, he shall, in addition to the assessment of such intangible personal property for that year, assess the same separately for such year or years that it may have escaped taxation at the full cash value thereof in such year * * *." (Italics supplied.)
Intangible personal property which has been honestly returned and which has been assessed by the tax assessor at its returned value without increase in valuation having been made by him as provided in Sections 199.09 and 199.10 and the taxes upon which property have been paid, cannot be said to have "escaped taxation" nor to have been "omitted" from the tax roll. City of Georgetown v. Graves' Adm'r, 165 Ky. 676, 178 S.W. 1035; Commonwealth v. American Tobacco Co., 96 S.W. 466, 29 Ky.Law Rep. 745; Delta Land & Timber Co. v. Police Jury, 169 La. 537, 125 So. 585; Adams v. Luce, 87 Miss. 220, 39 So. 418; Robertson v. Bank of Yazoo City, 123 Miss. 380, 85 So. 177. In the instant suits there is no charge of fraud or concealment against the Trustees.
In Section 199.09, supra, the tax assessor is authorized, after the filing of a return and upon notice to the person so filing it, to increase the valuation of intangible personal property which had been returned at a value less than its full cash value. The tax assessor is also empowered, after notice, to place upon the tax roll intangible personal property subject to taxation which was not included in the taxpayer's return. However, Section 199.29 only authorizes the tax assessor to back-assess intangible personal property which for any reason has "escaped taxation" *757  not to raise the valuation of intangible personal property which originally had been erroneously valued. The failure of the legislature to authorize the tax assessor in Section 199.29 to raise the valuation of intangibles which initially had been erroneously valued is, to our minds, very significant. Had the legislature intended to grant the power to, and to direct, the tax assessor to back-assess because of an inaccurate original valuation, we have no doubt it would, as it should, have done so clearly and unequivocally in Section 199.29.
If the assessor upon the filing of the return increases the valuation, or fails to increase it, the intangible, nevertheless, has been taxed. Certainly it has not "escaped taxation."
It cannot be said that the legislature in the enactment of Chapter 199, supra, did not have in mind the possibility of undervaluation because it dealt with that subject in Sections 199.09 and 199.10. Since it did deal with that topic in those sections, it is reasonable and appropriate to presume that it concluded such motif therein and designedly omitted from Section 199.29 the authority to back-assess because of a failure on the part of the assessor to assess any intangible at its full cash value. Indeed, having directed the tax assessor to take care of an undervaluation at the time of the filing of the return, the legislature undoubtedly assumed, as it had a right to assume, that the tax assessor would perform his duty at the proper time and in the proper manner. This was not a rash presumption for it is compatible with a well recognized legal principle to presume that every official will perform or has performed the duties imposed upon him by law. Higbee v. Housing Authority of Jacksonville, 143 Fla. 560, 197 So. 479; Peacock v. Roberts, 142 Fla. 701, 195 So. 914; Pridgen v. Sweat, 125 Fla. 598, 170 So. 653; State ex rel. W.R. Clark Printing & Binding Co., Inc., v. Lee, 121 Fla. 320, 163 So. 702; State ex rel. Railroad Com'rs v. Florida East Coast R. Co., 64 Fla. 112, 59 So. 385; Scott v. State, 43 Fla. 396, 31 So. 244; 43 Am.Jur. 254; 31 C.J.S., Evidence, § 146, page 799.
The real purpose of Section 199.29 was to give to the assessor for a limited period of three years the continuing authority to back-assess intangible personal property which because of inadvertence or design had been omitted by the taxpayer from his return and thus to provide the means of preventing intangible personal property which actually never had been assessed from escaping its fair share of the public burden of taxation.
One opportunity to amend the taxpayer's return and to increase the valuation placed upon the intangible personal property by the owner and taxpayer is ample because the evil of non-disclosure is not involved. There was no occasion to grant continuing power to the assessor to revise a return and back-assess on account of undervaluation of intangible personal property which had been honestly returned for taxation. More certainly no such provision was made in Section 199.29.
In our consideration of the subject now under discussion it is well to keep in mind the fact that we are dealing only with the tax returns made by the Trustees under the will of the late Alfred I. duPont. We do not find in the record any suggestion that an attempt has ever been made to tax the interests, whatever they may be, of any of the annuitants named in Mr. duPont's will. Although the "taxpayer" liable for the payment of a tax may be either the owner of the legal title to intangible personal property or the owner of an equitable beneficial interest therein, which is a separate and distinct species of intangible personal property,[2] the fact remains that it is intangible personal property owned and returned for taxation by said Trustees which was taxed under the provisions of Chapter 199, F.S. 1941, F.S.A. Consequently, it follows, as night follows day, that such intangible is the only property *758 which could ever be classified as having "escaped taxation" as those words are used in Section 199.29.
The trust res (shares of corporate stock) owned and held in this State by the Trustees, is the intangible personal property which was taxed in the cases now before us. The fact that an equitable, beneficial interest in the trust res of one or more cestui que trustent might also be classified as intangible property subject to taxation by virtue of the provisos contained in Chapter 199, supra, is not important herein except in connection with appellants' contention that Nemours Foundation has such an interest which should be held exempt and that such exemption should be visited upon the corpus of the trust in the hands of the Trustees or at least upon that part of the trust res which, loosely speaking, produces 12% of the residuary net income.
It is true that intangible personal property is defined by statute as being "all personal property which is not in itself intrinsically valuable but which derives its chief value from that which it represents" but this by no means is equivalent to declaring that the tax is levied upon the value of, rather than upon, the intangible. The tax provided by Chapter 199, supra, is an ad valorem tax; hence the tax is necessarily computed upon, and fixed according to, the value of the intangible.
There is no provision in Chapter 199, supra, which authorizes a tax upon only a part of an intangible returned for taxation by the owner thereof albeit separate distinct interests therein, each of which in and of itself may be said to constitute a species of intangible personal property, might be independently taxed.
The intangible is the property of the taxpayer which is the subject of taxation. If the intangible has been honestly returned and assessed for taxation, regardless of the valuation placed upon it, and the tax has been paid, the intangible has been taxed and thereafter cannot be said to have "escaped taxation." It is either taxed or is not taxed. In the latter event only has it "escaped taxation."
Finally, we observe that the construction which we now place upon Section 199.29, supra, is fortified, if forsooth it needs reinforcement, by the general rule, which is well established in this, if not in every jurisdiction, that statutes providing for taxation are to be construed strictly as against the state and in favor of the taxpayer. State ex rel. Tampa Electric Co. v. Gay, Fla., 40 So.2d 225; DeVore v. Gay, Fla., 39 So.2d 796; Walgreen Drug Stores Co. v. Lee, 158 Fla. 260, 28 So.2d 535; Florida Industrial Commission v. Growers Equipment Co., 152 Fla. 595, 12 So.2d 889; Lee v. Walgreen Drug Stores Co., 151 Fla. 648, 10 So.2d 314; Cunningham v. Stefanidi, 144 Fla. 214, 197 So. 722; 51 Am.Jur. 367; 61 C.J. 168.
Upon reflection we are inclined to the view that inadvertently we were guilty of invading the legislative field in our opinion in Root v. Wood, supra. Under our form of government providing for three distinct independent branches the invasion by one department of the sphere of operation of another is not permitted. No division, be it executive, legislative or judicial, may usurp the powers of either of the other arms. It is our conclusion upon this point that we should recede from our pronouncement in the case of Root v. Wood, supra. We hold that when intangible personal property has been honestly returned for taxation and the assessor has assessed such property without increasing the valuation thereof as provided in Sections 199.09 and 199.10, supra, and the taxes have been paid, the intangible personal property cannot be back-assessed, regardless of the fact that subsequently the tax assessor might decide that it was returned and assessed at a valuation less than its full cash value.
Appellants' second question is framed in the following language:
"(a) Where a return for intangible taxation is made which discloses all of the intangible personal property of the taxpayer, and the valuation of such property is discussed with and agreed to by the tax assessor and the taxpayer and determined by the tax assessor, and thereafter the Comptroller of the State of Florida directs the tax assessor to increase the valuation *759 shown on the return, and the tax assessor announced to the Board of Equalization that he had received such instructions and could not do otherwise than assess the taxpayer accordingly, and the Board of Equalization denied the protest of the taxpayer against such increased assessments, solely upon the same grounds, is not the increased assessment for such year invalid to the extent of such increase?
"(b) Where in subsequent years the same assessor made the same increases in valuation shown on the returns for such years, and said assessor and the Board of Equalization denied the protests made against such increased assessments, severally, on the sole ground that the assessor had been furnished by the office of the Comptroller with an opinion of the Attorney General which was contrary to the allowance of the claims of such taxpayer, is not the increased assessment for each such year invalid to the extent of such increase?"
The trial court answered this question in the negative.
It appears to be the position of appellants that the tax assessor changed the appellants' 1944 return, and that the Board of County Commissioners, sitting as an Equalization Board in connection with the intangible tax roll, confirmed the assessor's revision of the return, solely upon the direction of the Comptroller and/or the Attorney General, and although the tax assessor ostensibly followed the procedure outlined in Section 199.09, supra, he did not review or reconsider the original return in the manner provided by Section 199.09, supra, as his duties under said Section were outlined by us in our opinion in Root v. Wood, supra. Appellants further contend that in the assessments for the years 1945 and 1946 the conduct of the Comptroller, the assessor and the Board of Equalization likewise "came squarely within the interdictions of this Court in Root v. Wood."
Counsel for appellants hold the view that the tax assessor's announcement to the Equalization Board "that he had received instructions from State Comptroller Lee to disregard and disallow the discount and disregard and disallow the charitable interest and charitable deduction in making up the 1944 Rolls and could not do otherwise than to assess the Trustees accordingly and to stand to that assessment" was proof of the fact that he himself failed to review and reconsider the 1944 return and to make findings[3] that he had committed error originally in accepting the 1944 return as it was prepared by the appellants. We cannot agree with counsels' contention.
Upon a restudy of our opinion in Root v. Wood, supra, [155 Fla. 613, 21 So.2d 136.] and of the original file in that case we find several material facts were established which were not proven in the cases at bar. In the case of Root v. Wood, supra, the tax assessor failed to give notice to the taxpayer and he was, therefore, deprived of an "opportunity to be heard and give evidence in support of the integrity of his return." Furthermore, it was made to appear clearly that the tax assessor imposed the tax and the Board of Equalization approved it solely upon the direction of the Comptroller. We emphasized the fact that the taxpayer was never given an opportunity "to be heard anywhere any time." Indeed, we declared that "The record does not show that any aspect of the law was observed in making the assessment in question."
In the instant cases the tax assessor gave notice of his intention to change the return as is required by Section 199.09, supra. Moreover, in his notice [letter of October 25, 1944  Plaintiffs' Exhibit #34] the tax assessor made his own statement to the taxpayer that "These deductions should not have been taken * * *." In another letter [Plaintiffs' Exhibit #35] to the appellants the assessor stated "The Attorney General is also of the opinion that this should not be allowed, and I have, therefore, *760 eliminated the deduction from your return, * * *." (Emphasis supplied.) The Comptroller, under date of March 8, 1945, [Defendant's Exhibit #4] wrote the assessor and made it clear to him that the Comptroller was not attempting to coerce the assessor. In that letter he employed the following unambiguous language:
"Please understand that the Comptroller is not ordering you not to allow blockage, nor is he ordering you not to assess the property in the manner shown on the return, but the Comptroller is advising you that there is no provision of law for allowing the blockage and that the return as made is incorrect because the interest of the beneficiary is not a beneficial interest." (Emphasis supplied.)
Finally, the tax assessor informed the Comptroller that he had "made it very clear to the Board that the back assessments were not made upon your instructions, but as provided by the Act, and Mr. Adair thoroughly understands this to be the case." [Defendant's Exhibit #7.] (Emphasis supplied.)
Thus, it may be seen that in these cases the appellants have failed to carry their burden of overcoming the presumption that the tax assessor performed his duty in a proper manner, while in the case of Root v. Wood, supra, the taxpayer carried such burden.
It is clear from the record that the tax assessor's error in accepting the appellants' return as made by them was pointed out to him by the Comptroller and/or the Attorney General. It is likewise evident that the assessor performed his duty "to consider the information furnished him by the Comptroller * * *" but the appellants have failed to carry their burden of making it appear clearly that in fact the tax assessor did not perform his duties independently but acted solely upon the directions of the Comptroller and/or the Attorney General. As we have previously pointed out herein, there is a well established presumption of law that every officer has properly performed his duty and the record in this case does not convince us that such presumption was overcome by proof to the contrary.
What we have had to say herein with reference to the revised assessment for the year 1944 is equally applicable to the amended assessments for the years 1945 and 1946.
We conclude that the redacted assessments for the years 1944, 1945 and 1946, insofar as they are challenged by the appellants in their argument under question number two is concerned, were and are valid and that appellants failed to make the invalidity of such assessments clearly apparent.
Appellants' third and fourth questions will be discussed simultaneously. They are posed by counsel as follows:
"Third Question: Is a devise to charity of trust income in perpetuity (subject to annuities) an item of `intangible personal property belonging to' a charitable association which is `exempt from taxation' under the Intangible Personal Property Taxation Act of 1941?"
"Fourth Question: Would not the taxing of the intangible personal property comprised of remainder beneficial interest which is vested in the Foundation (or in the segment of the public to be served by it) result, to that extent, in the imposition of a tax upon the income of Mrs. duPont, in violation of Section 11, of Article IX of the State Constitution?"
We shall also deal, in connection with Questions Three and Four, with appellee's cross-assignments of error upon the matter of the exemption which the Chancellor allowed the Trustees of that part of the trust res which produces 12% of the residuary net income.
Counsel for appellee do not agree that appellants' Third Question "is entirely applicable to the question of law presented by the record for adjudication" and state that it "would appear to transcend any issue of fact or of law presented by the record in the case at bar." Their idea of the true question before us is framed by them in the following manner:
"Does a bequest to a charitable institution, to be enjoyed in the future, *761 of the net income derived from intangible personal property in the nature of shares of corporate stock, held in trust in perpetuity, and directed to be used for charitable purposes only, under a testamentary trust containing an express condition that the corpus of the trust shall in no event at any time be diminished by using any portion thereof for the charitable purpose defined, vest in the charitable institution any interest or estate in the corpus of the trust which would entitle the corpus to exemption from intangible personal property tax imposed under the provisions of Chapter 199, Florida Statutes 1941?"
Counsel for appellee profess to be mystified as to how appellants' Fourth Question entered the case.
Regardless of the erudite thesis which counsel for appellants have presented for our consideration[4] in connection with their Third Question, we cannot subscribe to a conclusion both impractical and tenuous. We say impractical because if we should hold that Nemours Foundation upon the death of Mr. duPont became vested with or has had since its creation a beneficial interest in the entire trust corpus and should determine to exempt the trust res owned by the Trustees from taxation, we would open the door to the possibility of large scale tax evasion. In such event a wealthy individual could establish an irrevocable charitable trust, reserve unto himself, and possibly his wife, for and during their natural lives all of the income from the trust res and thus avoid the intangible personal property tax for the remainder of his life and/or that of his wife. In this hypothetical situation the charity, as in this case, would ultimately receive the net income from the trust but again, as in this case should we follow argument of counsel for appellants, the corpus of the trust could not be taxed from and after the creation or effective date of the irrevocable trust.
We say tenuous because there has been no attempt to tax the alleged beneficial interest of either Mrs. duPont or Nemours Foundation and, what is more important, neither of those annuitants has any equitable or beneficial interest in the trust res itself which can be classified as a species of intangible personal property subject to taxation under any of the provisions of Chapter 199, supra. Furthermore, if the interest of either of these beneficiaries, however it may be classified, could be said to be a species of intangible personal property, each is a separate and distinct interest and might be taxable or exempt from taxation without regard to the question whether the intangible personal property which constitutes the corpus of the trust is subject to taxation in the hands of the Trustees.
Moreover, granting argumenti causa only that the interest of either Mrs. duPont or that of the Foundation can be said to be a beneficial interest in the trust res itself, neither interest could have been subjected to taxation after the 1943 amendment of Section 199.02 because the amendment provides: "that when the trustee is a resident of Florida[5] and [when he] returns the corpus of the trust for taxation as provided by law there shall be no tax upon the beneficial interest in such trust." (Italics supplied.)
The obvious purpose of the 1943 legislative amendment was to make certain, by exempting (in effect) the interest of the cestui que trust when the trust res is situate in this State and the Florida trustee returns the corpus of the trust for taxation, that no question of double taxation could possibly arise. Our intangible personal property statute has from its inception defined all *762 stocks or shares of incorporated or unincorporated companies as being intangible personal property subject to taxation. Consequently, when such intangible personal property has its taxing situs in Florida and is subject, as it is, to being taxed in the hands of the Trustees, the legislature wished to make it very clear that such tax would be the only tax to which such intangible personal property could be subjected directly or indirectly.
The record shows that the Trustees returned the trust res for taxation as provided by law. It is of no moment that the Trustees in making their several returns disclosed the respective interests of the beneficiaries in and to the net income produced by the trust res and claimed an exemption in their (the Trustees') favor by virtue of the alleged beneficial interest of the Foundation in the corpus of the trust. The Trustees made the returns which are before us as they were required to do by Section 199.07, supra. Since the shares of stock constitute intangible personal property to which the Trustees hold legal title and which is separate and distinct from the interests of the beneficiaries, and as such has been taxed, it is only necessary for us to decide whether such intangible personal property was lawfully taxed.
The real query for our determination in connection with appellants' third and fourth questions is whether the corpus of the trust owned by the Trustees, which ownership is unbridled except as to the application and use of the net income, may be assessed for taxation under the provisions of Chapter 199, supra, in any and all events  that is to say  without regard to the taxability of the interest of any cestui que trust or the exemption which might exist in his favor because of the nature of his interest or the uses and purposes for which such interest was created and to which such interest was dedicated.
We have never had occasion to decide the foregoing question, although we have held that the beneficial interest of a cestui que trust in the trust res may be of such nature as to constitute it a species of intangible personal property which is subject to taxation by virtue of the effect and operation of Chapter 199, supra. Wood v. Ford, 148 Fla. 66, 3 So.2d 490. In the last cited case, as well as in the cases of Owens v. Fosdick, 153 Fla. 17, 13 So.2d 700, and Burrows v. Hagerman, 159 Fla. 826, 33 So.2d 34, we committed this Court to the proposition that the legal title to the corpus of the trust held by the trustee and the equitable beneficial interest in the trust res, if any, are separate and distinct interests and each constitutes a type or species of intangible personal property which may be subject to taxation.
In Wood v. Ford, supra, we determined that the interest of the cestui que trust was subject to taxation because the beneficiary was vested with the power of appointment by will of the entire property and the corpus was subject, during his lifetime under certain conditions, to invasion for his benefit. In the case of Owens v. Fosdick, supra, we held that Mrs. Fosdick (the cestui que trust) did not have a vested beneficial interest in the corpus of the trust because she had no power over or control of the trust res but only the right to receive the income therefrom which caused her beneficial interest to partake more of the nature of an interest in income than an interest in the trust res itself. In each of these cases the residence or principal place of business of the trustee, as well as the locale of the trust corpus, was in a foreign jurisdiction. Consequently, it was not only unnecessary and improper but indeed impossible to decide effectively the question whether the corpus of the trust in the hands of a trustee in another state was subject to or exempt from taxation.
Intangible personal property which is subject to taxation by virtue of the provisions of our statute is set forth with particularity in Section 199.02 thereof. Said Section, for the purpose of taxation, divides intangible personal property into four classes, A, B, C and D. The intangible personal property involved herein is listed in Class B which provides:
"Class B intangible personal property is hereby defined as being all stocks, or shares of incorporated or unincorporated companies; * * *."
*763 It is patent upon a cursory examination of the foregoing section of our statute that stocks, or shares of incorporated or unincorporated companies, constitute intangible personal property which is subject to taxation in this State and that this provision in our statute is the specific authority for the taxes which were levied in these cases against the Trustees as owners of such intangible personal property.
Appellants state as their major premise in connection with their third question that "Any person who, or corporation which, owns a remainder subject to a life estate in property has a present beneficial interest therein, despite the fact that he or it does not receive the current income." They rely upon our opinion in Commercial Bldg. Co. v. Parslow, 93 Fla. 143, 112 So. 378, 382, wherein we said that a vested remainder "is a species of property in which the present estate or interest passes to the beneficiary with the right of enjoyment suspended to some future date." Counsel then proceed to argue that such present beneficial interest is exempt from taxation because it is a valuable ownership right of personal property "belonging to" a Florida non-profit charitable institution (Nemours Foundation). They state that "Any type of interest which would be taxable when belonging to a non-charitable owner would be exempt when belonging to charity." They conclude that the Nemours Foundation has a vested beneficial interest in the trust res and that such interest is exempt from taxation to the extent of the just valuation of such beneficial interest under the Florida intangible tax law because it is properly classified as "belonging to" a charitable association. The exemption to which they refer, insofar as it is applicable in the instant cases, reads as follows: "Intangible personal property belonging to the State of Florida, or * * * to any * * * charitable * * * association shall be exempt from taxation." F.S.A. § 199.02(5). Appellants cite Wood v. Ford, supra; Mahan v. Lummus, 160 Fla. 505, 35 So.2d 725; Burrows v. Hagerman, supra; Owens v. Fosdick, supra, and Williston Seminary v. County Commissioners, 147 Mass. 427, 18 N.E. 210, to support their ratiocination.
At this point it is well for us to determine just what right, if any, the Nemours Foundation has to a remainder beneficial interest, or what right either it or Mrs. duPont has to any interest or estate, in the corpus of the trust. Counsel for appellants rely heavily upon Commercial Bldg. Co. v. Parslow, supra, and Wood v. Ford, supra, to support their contention that the Nemours Foundation has a present beneficial equitable estate in the trust res which under the Florida intangible tax statute is exempt from taxation. In our review of the case of Commercial Bldg. Co. v. Parslow, supra, we find that the real question which was decided was one dealing with the subject of application of laches or estoppel or the Statute of Limitations as against a remainderman prior to the termination of the life estate. In that case the remainderman unquestionably owned a vested remainder in real estate (the trust res) which was limited only by life tenancy. In the Parslow case we said: "A vested remainder such as we are dealing with here is a species of property in which the present estate or interest passes to the beneficiary with the right of enjoyment suspended to some future date." [93 Fla. 143, 112 So. 382.] (Italics supplied.)
The Nemours Foundation has never, nor will it ever, become vested with any estate in the corpus of the trust. The most that can be said is that it is entitled to succeed to a life estate in the net income which the trust res might produce. It never has been, and under the terms of the duPont will, never will become the owner of the corpus of the trust estate or any part thereof. In and by his will Mr. duPont created a trust estate composed of a large block of common capital stock of E.I. duPont de Nemours & Company but he did not give to Nemours Foundation any right except one to receive, in futuro, the net income therefrom.
In the case of Wood v. Ford, supra [148 Fla. 66, 3 So.2d 494], the person who was held by this Court to have a present beneficial interest in the trust estate which was subject to taxation was invested with the power of appointment by will and under certain circumstances the corpus could be invaded for his benefit. In such situation *764 we said: "This necessarily vests in the cestui que trust now domiciled in Florida a present beneficial equitable estate, right or interest in the trust property, * * * for his sole use and purposes during his life, with the power of appointment by will of the entire property." It is clear that we did not hold it was the mere right to receive income which was taxable but only that the vested beneficial equitable estate in the trust corpus was a species of intangible personal property and was subject to taxation under the provisions of our intangible tax law. In the instant cases the charitable foundation has no right except one to receive a portion (ultimately all) of the net income from the trust property and the right to compel performance of the trust. It does not have any power of appointment of, right to use or dispose of, incident of ownership in or any control whatsoever over, the corpus of the trust; nor does it have possession of, or right of possession thereto.
We have reached the conclusion that the case of Owens v. Fosdick, supra [153 Fla. 17, 13 So.2d 703], is controlling upon the question of whether the Nemours Foundation or Mrs. duPont has a present beneficial interest in the trust estate which is subject to taxation. Counsel for appellants attempt to differentiate this case from the cases at bar by construing our opinion as holding that Mrs. Fosdick (the beneficiary) had an interest in the nature of a beneficial interest or estate in income and for that reason only such interest as she possessed could not be taxed because it would amount to taxing income which is interdicted by Section 11, Article IX of the Florida Constitution, F.S.A. We did, in effect, so hold but in so doing we used the following language:
"* * * if the cestui que trust has a vested beneficial interest, or esstate at all, it is more in the nature of a beneficial interest or estate in income than in the trust res itself. In our view, a tax on such interest, or estate, would so closely partake of a tax on income as to be tantamount to a tax on income; and hence violative of the spirit and intent of section 11 of Article IX of the Constitution of Florida." (Italics supplied.)
We also compared the nature of the rights of the beneficiary in Wood v. Ford, supra, with those of Mrs. Fosdick and said, at least by posing and answering a query, that Mrs. Fosdick had no incident of ownership in the trust estate which could logically be disassociated from the income itself. In that case we said:
"The cestui que trust has no power of appointment of the corpus, no future estate in remainder, and no present interest in the res aside from a right in equity to compel the performance of the trust. In short, so far as the trust res is concerned there never has been, nor never can be, a time when the respondent, Emily Bedford Fosdick, could, or can, assert any right of possession, control, or ownership over the securities." (Italics supplied.)
Paraphrasing, we now say that in the instant cases, the Nemours Foundation has no power of appointment of the corpus, no future estate in remainder in the trust estate, and no present interest in the res itself aside from a right in equity to compel the performance of the trust. In short, so far as the trust res is concerned, there never has been, nor ever can be, a time when either Mrs. duPont or Nemours Foundation could, or can, assert any right of possession, control or ownership over the securities. We repeat for the sake of emphasis that in the Fosdick case we held Mrs. Fosdick, if forsooth she had any type of interest or estate, to be possessed of a beneficial interest or estate in income. We indicated with clarity, if it may be argued we did not decide, that Mrs. Fosdick did not have a vested beneficial interest or estate in the corpus of the trust. In these cases we hold expressly that neither Mrs. duPont nor Nemours Foundation has any vested beneficial interest in the trust res and if she or it has any equitable or beneficial interest or estate at all it is in the nature of an interest or estate in "net income." The question whether such interest as Mrs. duPont or Nemours *765 Foundation has in the "net income" is taxable as a species of intangible personal property, and if so whether it is exempt, is not presented by the record. Indeed, it is clear that the tax assessor did not attempt to levy any tax except upon the intangible personal property returned for taxation by the Trustees as owners of the legal title thereto.
The Nemours Foundation does not have a vested beneficial interest in the corpus of the trust which would be subject to taxation under the Florida intangible personal property tax law if it were not a charitable institution. Therefore, it does not have an equitable beneficial interest in the trust res which may be said to be exempt from taxation; nor is Mrs. duPont in any different situation.
We hold that the intangible personal property constituting the corpus of the trust and which is owned by the Trustees was and is subject to taxation as provided in Chapter 199, supra, regardless of whether the alleged beneficial interests of the cestui que trustent, which, if actually existent, are likewise separate and distinct interests, may as such be subject to taxation and possibly exempt therefrom because of any exemption set forth in our statute or created by virtue of our constitutional prohibition against an income tax.
So it is, we answer in the affirmative the question which we posed at the outset of this discussion. We further expressly hold that since Section 199.07, supra, mandatorily requires trustees, among other fiduciaries, to file a sworn return of intangible personal property over which they have control and management or of which they have custody, it was the clear intent of the legislature that such trustees should pay taxes thereon. Our view is buttressed, not to say clinched, by the fact that the legislature in its 1943 amendment of Section 199.02 exempted from taxation the beneficial interest of a cestui que trust "when the trustee is a resident of Florida and returns the corpus of the trust for taxation as provided by law * * *." (Italics supplied.) Without doubt the trust res involved herein is intangible personal property. It is specifically defined in Class "B" of Section 199.02 as being intangible personal property subject to taxation under the provisions of Chapter 199, supra, and it is owned by the Trustees.
We are, therefore, of the opinion under the circumstances of these cases that no exemption should have been allowed to the Trustees because of the charitable character of Nemours Foundation, nor should an exemption be allowed them because Mrs. duPont's interest is more in the nature of a beneficial interest in the net income than in the trust res itself. Consequently, we conclude that the learned Chancellor was eminently correct in holding the trust res, which is owned by the Trustees and has its taxing situs in this State[6] subject to taxation, but that he erred in exempting from taxation that part of the trust corpus which is proportionate thereto as 12% of the residue of net income is proportionate to the entire net income.
Were we to uphold the Chancellor and exempt from taxation that part of the trust res which produces 12% of the residuary net income our ruling would be tantamount to holding that no part of the trust corpus has ever been or could ever be lawfully taxed. Were we to visit the charitable exemption over and upon the trust res we should also visit upon the corpus of the trust the exemption granted Mrs. duPont and all other beneficiaries by our Constitutional amendment which prohibits a tax upon income. There is no logical reason why one exemption should be allowed and the other disallowed. Consequently, the end result would be the same were we to affirm the Chancellor's ruling as it would have been had we agreed with the argument of counsel for appellants in support of their contention made in connection with the third question posed by them. Such contention was that the entire *766 corpus should be held exempt from taxation because the charitable organization (Nemours Foundation) has a vested beneficial interest in the whole of the trust res with the right of enjoyment merely suspended during the lives of other annuitants.
We are conscious of the fact that our ruling disallowing the aforementioned exemption to the Trustees is contrary to that made in at least one other jurisdiction but it is our duty to determine questions presented by the facts of these cases in the light of our statute and consonant with our own decisions which, by analogy, lead us to the conclusion we have expressed herein.
In most, if not all, of the cases cited by counsel for appellants which they consider contra to our holding the assessment under consideration had been made to the cestui que trust (the charity or other association exempt from taxation) which was ultimately to receive the corpus of the trust and the interest of the cestui que trust was not limited solely to income in perpetuity. The only case we have found which we consider directly in point and which is contra to our ruling is Watson v. City of Boston, 209 Mass. 18, 95 N.E. 302. However, our determination is not without strong support. See Heuck v. Haefner, 51 Ohio App. 74, 199 N.E. 701, 108 A.L.R. 294; Smith v. Board of Review of Carroll County, 305 Ill. 38, 136 N.E. 787 and In re Petition of Allerton, 296 Ill. 340, 129 N.E. 801.
In the case of Heuck v. Haefner, supra, [51 Ohio App. 74, 199 N.E. 704], the question which is the subject of our present discussion was expressly passed upon contrary to appellants' contention. In that case the Court of Appeals of Ohio said:
"However, in the instant case, it will be noted from the terms of the will that no one except the trustees has any interest of any nature whatever in the corpus of the trust fund. The tax on intangibles is not upon the income  it is upon the investments  and merely the rate of tax is regulated by the income. In the case of a nonproductive investment, the rate is fixed as a certain percentage of the value of the investment. Obviously, from the terms of the will, the University of Cincinnati and the Art Museum can have no interest in anything but the income from the trust fund. Neither of these institutions has any interest, either legal or equitable, in the investment proper. Whether these beneficiaries are subject to tax for their equitable interest in the accumulated income is a question which is not before us directly or indirectly. The question is whether the investments in the hands of the trustees are taxable in their hands as the owners thereof. We have no difficulty in finding that the trustees are the owners of such investments, and that such ownership is unqualified except as to the use of the income."
It has been aptly stated by counsel for appellants that ownership is the test of exemption and that the right to an exemption is entirely dependent upon ownership. We are impelled to observe that ownership is likewise the only criterion for taxation and that lawful power to tax must exist before an exemption can be created. The intangible personal property which constitutes the trust res and which was taxed in these cases is owned by the Trustees and none of the cestui que trustent owns any beneficial interest in the corpus of the trust. Moreover, we are constrained to reiterate our fundamental premise that no attempt to tax the alleged beneficial interest of any of the cestui que trustent is disclosed by the record before us.
Because the Court is divided four to three with reference to the proper answer to be given appellants' fifth question, we will at this juncture take up appellants' sixth and final contention that one-fourth of the trust assets should be held to be immune from the Florida intangible personal property tax because one of the four testamentary Trustees is a non-resident of the State of Florida. We find no merit whatsoever in this contention. Indeed, counsel for appellants very frankly suggest that they do not believe their position in connection *767 with this point is bottomed upon a sound principle of law.
Suffice it to say that the entire corpus of the trust herein involved is located in Florida; two of the Trustees are residents of Florida and the corporate Trustee, which has actual custody or control of the trust res, has its principal place of business in this State. Moreover, although the Trustees' powers are joint and equal under the will in all other matters, the will contains the following provision:
"Should at any time a question arise in the minds of my Trustees concerning the propriety of doing or refraining from doing, anything in the discharging of their duties as Trustees, then the decision of the majority of my Trustees must rule. Should a majority decision be impossible, then the ruling of the corporate Trustee must be final." (Italics supplied.)
We approve the rule as it is stated by Bogert on Trusts and Trustees, Vol. 2, Section 262, page 842:
"Where there are two or more trustees residing in different states, the courts are in fairly general agreement, where a different rule is not established by statute, that the property will be taxable in the state of residence of the trustee who has actual custody or control of it." (Italics supplied.)
Appellants' fifth question is stated by their counsel in the following language:
"In valuing for taxation as of January 1 in each of the years 1941 to 1946 inclusive, under the Florida Intangible Personal Property Taxation Law of 1941 in the hands of the Trustees of the trust estate a block consisting of 241,870 shares (231,870 shares in the years 1945 and 1946) of the common capital stock of E.I. duPont de Nemours & Company, which is a stock listed upon and dealt in on the New York Stock Exchange, is the tax assessor required as a matter of law to value such block of stock at the same price per share as the price per share at which said stock was selling on said Exchange at the close of business on the preceding December 31, notwithstanding the undisputed evidence to the effect that only a few shares were sold on that date, that this large block could not have been sold on that day or within a reasonable time thereafter, on that exchange or elsewhere for that price, and that the fair market value of this large block per share was a substantially lesser sum, the level of which is shown by the uncontradicted evidence?"
Chief Justice Sebring and Justices Chapman, Thomas and Mathews are of the opinion that this query should be answered in the affirmative or at least they hold the view that the socalled "Blockage Discount Theory" should not have been applied in these cases and feel that the Chancellor in refusing to apply it acted correctly and should be affirmed.
On the other hand, Justices Terrell, Hobson and Roberts are of the opinion that the Chancellor erred in failing to apply the "Blockage Discount Theory" or to consider it as one of the factors in determining the full cash value of the intangible personal property owned and held by the Trustees.
We are in agreement in believing that the Chancellor did consider the evidence offered by appellants in support of the "Blockage Rule" or "Blockage Discount Theory." The majority feels that after so considering such evidence the Chancellor properly decided that said rule or theory should not be applied in these cases. The minority entertains a contrary view.
The Chancellor found from the evidence that there was no necessity for placing large blocks of shares of stock on the market nor was there even a probability that it would or might be done and consequently, there was no occasion for invocation of the "Blockage Rule." The majority concurs in this view and is further of the opinion that the burden of showing the necessity or probability of a sale, or some facts which would make the rule or doctrine applicable was on the plaintiffs and that they not only failed to meet this burden but their positive testimony shows that there was no necessity or probability that the stock would be sold.
*768 The majority view is further exemplified by the following observations which were prepared by Mr. Justice Mathews:
The testimony of the two experts offered by the appellants with reference to the blockage theory or rule was to the effect that it did not apply unless there was to be a sale of the large block of stock.
If no necessity exists for the sale of this large block of stock, and no reason of any kind whatsoever has been shown by the testimony why it should be sold now or at any time in the immediate future, it would be a breach of duty on the part of the trustees to sell this block of stock when they know, as the testimony shows, that if they dumped it on the market all at one time, the market would be depressed and they could not get the full market value as it now exists.
I have examined all of the cases cited and so far as I can determine, all of them were based upon the necessity of selling a large block of stock in order to get money for a particular purpose, such as estate taxes, inheritance taxes, or income taxes. We have no such necessity shown or suggested in this case.
The will of Mr. duPont contains the following provisions:
"To invest and reinvest the assets of my estate or the proceeds of any sale or disposition thereof, in any corporate stocks, bonds or other securities, or in any other investments, either real or personal, or both, from time to time, not confining such investment or reinvestments to what are defined by the laws of any State as legal trust fund investments, with power to buy stocks and bonds and other securities at a premium to be paid out of and charged against the principal of the trust estate, and with power in their discretion to cause the securities which may, from time to time, comprise the trust estate, or any part or parts thereof, to be registered in their names as Trustees, or in the individual name of their nominee, or to take and keep the same unregistered and retain them or any part or parts thereof in such condition that they will pass by delivery, without liability for any loss that may result therefrom."
"To do every and all things that they may deem best for the conservation, protection and betterment of my estate, as fully and completely as I might do, personally, were I alive and able to act for myself."
It would not be for the "conservation, protection and betterment" of the estate for the Trustees to dump this stock on the market under the facts and circumstances developed in this case, and for them to do so would be a breach of their trust. It cannot be contemplated or presumed that the trustees have any idea of doing that which would not be best for the conservation, protection and betterment of the estate.
The time may come in the distant future when it would be necessary, for some reason which cannot be foreseen at the present time, for the trustees to sell this block of stock. When that time comes, the blockage rule or theory may be applicable and it should then be considered as one of the elements in determining full cash value, but until that time does come, there is no reason for the application of the rule.
From the record and evidence in this case it is clearly demonstrated: (1) that the Chancellor did take into account and consideration the evidence offered by the appellants with reference to the blockage rule or theory, and (2) that under the facts and circumstances in this case as shown by the record and the evidence, the blockage rule or theory did not apply because "no necessity for placing large blocks of the shares in question on the market has been shown or even a probability that it would be done."
The part of the decree of the Chancellor with reference to the "blockage rule" or "blockage discount theory" should be affirmed.
Justice Hobson is the author of the following comments which set forth the reasons underlying the minority view upon the question of the applicability of the "Blockage *769 Discount Theory." Justices Terrell and Roberts concur therein.
It is patent counsel for appellants contend that the so-called "Blockage Discount Theory" should have been applied or at least the testimony concerning and explaining it and the reasons for its application should have been given appropriate weight and consideration by the Chancellor in determining whether the assessor assessed the intangible personal property at "its full cash value" and that he should not have upheld the tax assessor's valuation which was predicated solely upon the New York Stock Exchange quotations as of December 31 preceding each taxable year.
The "Blockage Rule" or "Blockage Discount Theory" is of comparatively recent origin. It is predicated upon experience which teaches that the value of securities is materially affected by the unyielding law of supply and demand. It developed in recognition of the fact that ordinarily a large block of stock cannot be offered for sale on the market and turned into "cash" as readily as a small number of shares might be; that when the supply (offerings) of a particular security is greater than the market demand for the particular shares the market will go down and in a converse situation the market will go up.
The "Blockage Discount Theory" is properly classified as a rule of evidence. It should be considered or applied when and to the extent that the facts and circumstances of the case as disclosed by the evidence require. It is not an exclusive rule for fixing the value of large blocks of stock for taxation purposes any more than is the mean between high and low of the stock market quotations the sole criterion for fixing such value. The "Blockage Rule" does not necessarily or inevitably contemplate an immediate or single sale of all shares of a large block of stock which might drop the value thereof almost to the vanishing point but it anticipates a planned sales program which would be followed by a prudent businessman, especially one versed in the field of investments in corporate stock.
It is reasoned by those courts which apply the "Blockage Discount Theory" that the stock exchange quotations on a given date reflecting, as they usually do, only sales of a comparatively small number of shares, should not be used exclusively as a basis for fixing the value  certainly, I say, not the "full cash value"  of large blocks of the same stock.
The Chancellor obviously determined that the "full cash value" of the large block of duPont stock which is owned by the Trustees was the value of the total number of shares of such stock computed at the price per share at which the same type of corporate stock was sold on the Stock Exchange on December 31st next preceding the first day of January of each of the years involved in this litigation.
It was his conclusion that he should not apply the so-called "Blockage Discount Theory" or give any consideration or weight to the evidence which was produced by appellants in an attempt to show that the "full cash value" of this large block of stock was different from and less than the quoted New York Stock Exchange figures used by the tax assessor in fixing the value thereof. He held, "This Court is of the opinion that for the purposes of assessment for taxation large blocks of stock should be appraised on the same basis as small blocks of stock." He further expressed the view that "To assess a large block of stock owned by one person at a smaller value per unit than a small block of the same stock owned by another person is assessed per unit on the same day would inevitably result in injustice, inequality and lack of uniformity in taxation and would violate the laws and Constitution of our State."
I can readily agree with the first observation of the Chancellor hereinabove quoted, at least to the extent that the basis for assessing large or small blocks of stock should be the "same," that is to say the basis outlined in our statute, to-wit: "its [the intangible personal properties] full cash value." I do not, however, agree with his latter conclusion, for the reasons hereinafter stated.
I have studied all of the cases cited by appellants, the majority of which were Federal and Tax Court cases in which the *770 "Blockage Rule" is discussed and which cases dealt with estate and gift taxes. I have likewise made an independent investigation and find from all of the authorities which I have examined that the "Blockage Rule" has been applied in a majority, but not all, of these cases. I have also considered the case of Bingham's Administrator v. Commonwealth, 196 Ky. 318, 244 S.W. 781, upon which appellee lays great emphasis. Nor have I overlooked appellee's contention that the Federal cases cited by appellants deal with taxes in situations wherein transfers of title actually took place, which taxes fall into the category of excises and that our intangible tax law provides for ad valorem taxation.
Counsel for appellee make the bald assertion that since the Chancellor correctly held that no transfer of the shares of stock owned by the Trustees was in contemplation the "Blockage Discount Theory" could not possibly be applied in the instant suit. I conceive this statement to be tantamount to declaring that the "Blockage Discount Theory" should never be applied except in cases wherein taxes in the nature of transfer taxes are involved. I can see no logical reason, nor does counsel direct our attention to any, which justifies such a conclusion. The answer to this contention is found in our statute which provides that intangible personal property shall be assessed at "its full cash value." (Emphasis supplied.)
For several reasons, I cannot agree with the ruling made by the learned Chancellor. I am of the opinion his determination is equivalent to holding that the mean between high and low of the stock market quotations as of December 31st constitutes the only criterion for fixing the value of the large block of stock for taxation purposes. I am not in accord with such holding. I do not mean to say that it is not appropriate for the tax assessor when performing his duty of fixing the full cash value upon intangible personal property to use the stock market quotations on the last day of the year preceding the taxable year in arriving at his conclusions. The New York Stock Exchange quotations probably do reflect the "full cash value" of a comparatively small number of shares of a given stock, because it is reasonable to assume that those who purchase through the "Exchange" consider most, if not all [they rarely, if ever, are required to consider the "Blockage Rule"] of the elements which tend to establish value. Nevertheless, when the tax assessor predicates the assessment exclusively upon the "Exchange" quotations and the taxpayer challenges the value so placed on his intangible personal property it is proper to allow him to show, if he can, by the production of evidence that upon a consideration of all the factors pertaining to value, including the size of his block of shares, the "full cash value" of such property is less than the value so fixed by the assessor. I am not unmindful of the possibility that in some specific situation, not here existent, wherein a large block of stock represents the "control" of a particular corporation the "full cash value" might ultimately be determined to be greater than the value reflected by the "Exchange" quotations.
In the case of Root v. Wood, supra, [155 Fla. 613, 21 So.2d 137] we delineated some of the factors which may be pertinent in valuing shares of corporate stock for taxation as follows: "* * * ratio of assets to liabilities, funded debt, character of assets, value of assets, volume of business, impermanence of the business, attractiveness of the stock to investors, stability of net income from the assets, or any other impediments to true taxable value * * *."
The tax assessor in determining the full cash value of an unusually large block of shares of corporate stock should consider another vastly important factor, i.e., the irrefutable and logical theory behind the "Blockage Rule." The full cash value of such a block of stock cannot be appropriately approximated unless consideration is given to the amount of money the owner thereof might receive were he to sell it by use of the method recognized, accepted and approved by prudent businessmen everywhere, who are experienced in the investment mart, as being the most advantageous to the seller as well as being one which tends to safeguard the National economy.
*771 I do not believe, as did the Chancellor, that injustice, inequality and lack of uniformity in taxation would inevitably result in such manner as to violate the laws and Constitution of this State if a large block of stock owned by one person were assessed at a smaller value per unit than a small block of the same stock owned by another person might be assessed per unit on the same day. Our intangible tax law in Section 199.05, Florida Statutes 1941, F.S.A., provides that: "The tax assessor shall assess all intangible personal property at its full cash value." (Italics supplied.) In these cases the intangible personal property consists of some two hundred odd thousand shares of the corporate stock of Alfred I. duPont de Nemours & Company and this stock in its entirety constitutes the "intangible personal property" which is subject to taxation. The word "its" in Section 199.05, supra, refers in these cases to all of the shares of stock which are owned by the Trustees and which were returned for taxation. It is true that the tax was computed upon the basis of the unit (share) in which the stock is customarily bought and sold. This does not alter the fact that the intangible personal property which was subject to taxation and which was taxed was the entire number of shares situate in Florida and owned by the Trustees as such and "its full cash value" forms the basis for the tax levied against them (Trustees).
The common usage connotation of the word "cash" is money, ready money, money in hand, in bank or at command, and Chapter 199, supra, does not disclose a legislative intent that it should be given a different meaning. The "full cash value" of the stock (the intangible personal property) owned by one who has only a few shares of such stock should be figured on exactly the same basis as the "full cash value" of the stock owned by a person who possesses an unusually large block of the same stock. It is immaterial whether the owner of either a small block of stock or a large number of shares of the same stock might not contemplate the sale thereof, for the "full cash value" or "fair market value," see Root v. Wood, supra, can be appropriately determined in either event only upon consideration of all the factors which enter into the picture in determining the amount of money ("full cash value") which the owner of the intangible personal property could realize therefrom.
Such basis of determining the "full cash value" does not, in my opinion, offend against Section 1 of our Declaration of Rights which guarantees to all persons the equal protection of the law. Nor does it contravene the Fourteenth Amendment to the Federal Constitution, or Section 1 of Article IX of the State Constitution. In each instance the "full cash value" of the intangible personal property under one ownership is the sum of money  "cash"  which the owner might reasonably anticipate receiving, were he to sell it. Indeed, when all the elements which go to establish "full cash value," including the factors listed in Root v. Wood, supra, and the Stock Exchange quotations, as well as the principles underlying the "Blockage Discount Theory," are considered the result is consonant with, rather than in derogation of, Section 1 of our Declaration of Rights, the Fourteenth Amendment to the Federal Constitution and Section 1 of Article IX of the State Constitution, which provides for "a uniform and equal rate of taxation." Our intangible tax law makes the "full cash value" of intangible personal property the basis upon which the tax is laid. Consequently, when the "full cash value" of the intangible personal property of one owner is determined, and the "full cash value" of the intangible personal property of another is fixed upon a consideration of the factors which tend to establish value including the amount which each might realize in specie upon a sale thereof there is no inequality as between taxpayers and there has been full compliance with the Fourteenth Amendment to the Federal Constitution as well as Section 1 of Article IX of our Constitution. Indeed, the use in all cases of "Exchange" quotations to the exclusion of every other factor which indicates value would, as I see it, tend to create inequality as between taxpayers. The stock market quotations do not reflect in the case of an unusually large block of stock "its full cash value" which is the criterion for fixing the *772 value of intangible personal property for the purpose of taxation regardless of the number of shares  large or small  owned by the taxpayer.
With due respect to the majority view on the subject of the applicability of the "Blockage Rule," I am forced to observe that the testimony of the two experts to the effect that the "Blockage Rule" does not apply unless the sale of a large block of stock is contemplated, is not controlling upon the courts. Indeed, I feel that the majority has misunderstood the true import of such testimony. These witnesses explained the underlying reasons which gave rise to, and the modus operandi of, the "Blockage Discount Theory" which were proper subjects to be illucidated by them as expert witnesses upon the general subject of investments in corporate stocks. They said, in effect, unless there was to be a sale there would ordinarily be no occasion to apply said theory or rule. They simply meant by this that as experts in the field of investments they would not, and should not, give any thought to the theory behind the "Blockage Rule" unless they themselves, or some client for whom they were acting, might contemplate the sale or purchase of a large block of corporate stock. They certainly had no right and I do not believe attempted to usurp the prerogative of the courts of Florida of determining whether the "Blockage Discount Theory" should be applied in fixing the full cash value of intangible personal property for the purpose of taxation under the law of this State.
It is clear from the evidence in these cases that a prudent business man would not, unless forced by dint of circumstance, suddenly throw upon the market a block of stock such as that which is owned by the Trustees under the will of Alfred I. duPont. He would "feed" a given number of shares into the market at different intervals. However, the testimony in these cases shows that if such procedure were followed by the Trustees (and their duty as fiduciaries might at any time require it) and the "feeding" of the shares in comparatively small blocks were continued throughout the taxable year there would still be a drop of several points per share in the value of that particular stock. Aside from this, it has always been customary to consider, in determining the full cash value of any property for the purpose of taxation, the amount that such property might bring if the owner thereof were not in necessitous circumstances and the buyer were not compelled to purchase. Indeed, the amount of money which property of any character might bring were it to be sold is the most important, if not the controlling, factor in determining the fair market value or the full cash value of such property for the purpose of taxation. It is no answer to say that the "Blockage Discount Theory" contemplates a situation wherein the vendor is forced to sell because in determining, as required by the statute, "its [the intangible personal property subject to taxation] full cash value" the criterion is simply "its full cash value" which, of necessity, means the amount of money which the intangible personal property would bring if sold by the most advantageous method and in a transaction wherein neither party is coerced by any fact or circumstance.
I would hold that the Chancellor was in error in failing to take into account and to give proper weight to the evidence offered by the appellants and in refusing to apply the "Blockage Rule." He should have considered, along with the New York Stock Exchange quotations, other appropriate factors, including the evidence produced by appellants which was material in determining the "full cash value" of the large block of stock which was, and is, "the intangible personal property" subject to taxation under our law.
Summarizing, we hold that the back assessments for the years 1941, 1942 and 1943 were not authorized by law because the intangible personal property involved in these cases did not "escape taxation" in any one of those years; that the increased assessments for the years 1944, 1945 and 1946 were not invalid because, as it was alleged, the tax assessor increased the valuation shown on the returns solely upon the direction of the Comptroller; that the Trustees should not have been allowed any exemption by virtue of the charitable nature of Nemours Foundation, nor should they be *773 allowed any exemption because Mrs. duPont's interest is in the nature of an interest in net income and not taxable because of the impact of Section 11, Article IX of the Florida Constitution; that one-fourth of the trust assets should not be held to be immune from the Florida Intangible Personal Property Taxation Law because one of the four testamentary Trustees is a non-resident of the State of Florida, and that the Chancellor did not err in holding that under the facts and circumstances of these cases the "Blockage Discount Theory" or "Blockage Rule" should not be applied because "no necessity for placing large blocks of shares in question on the market has been shown or even a probability that it would be done."
Affirmed in part and reversed in part with directions to the Chancellor that he reconsider these cases and enter a final decree in each of them not inconsistent with the views of the majority as expressed herein.
SEBRING, C.J., and CHAPMAN, THOMAS and MATHEWS, JJ., concur.
TERRELL, J., I think the Chancellor should be affirmed as to exemption of 12% of Estate.
ROBERTS, J., I think the Chancellor should be affirmed as to exemption of 12% of Estate and reversed as to his failure to allow the blockage. Otherwise I agree to the opinion.
NOTES
[1] The Circuit Court in and for Duval County in the case of Reginald S. Huidekoper and Edward Ball as Co-Executors and Co-Trustees of the Last Will and Testament of Alfred I. duPont, deceased, v. The Florida National Bank, a banking corporation etc., et al., as Trustees, etc. et al., Chancery Case No. 37018-E, held, in effect, that Mrs. duPont was not prohibited by the will or any codicil thereto from irrevocably assigning any portion or all of her residuary equitable life estate to Nemours Foundation. No appeal was taken from the final decree of the Circuit Court which contained the foregoing ruling. Consequently, it is binding upon all parties to that cause.
[2] In some situations which we can envisage (for example, one wherein the residence of the Trustee and the situs of the corpus of the trust fund are in a jurisdiction foreign to that in which the beneficiary resides) both such owners might be held liable for taxes.
[3] There is no provision in Chapter 199, F.S. 1941, F.S.A., which requires the assessor to reduce his findings to writing, nor is there any statement in our opinion in Root v. Wood, supra, which intimates that he should do so.
[4] Verily counsel have prepared a learned, as well as a historically enlightening dissertation upon the significance of the Trustees' power of visitation granted to them by the will of Alfred I. duPont and upon the general subject of charitable trusts and their exemption from taxation.
[5] Three out of four  a majority  of the Trustees are residents of Florida and the trust res is owned and held by the Trustees in this State. Moreover, counsel for appellants in their brief hereinafter quoted admit that Florida is the situs of the trust and that the intangible personal property of which the trust fund is composed, the trust and the Trustees are subject to Florida jurisdiction.
[6] Counsel for appellants in their reply brief agree that "Florida is the situs of the trust" and "* * * that the Nemours Foundation was organized under Florida law; its situs and its intangibles are in Florida, and such intangibles, the trust and the trustees are subject to Florida jurisdiction."